# Exhibit 10



**TERRY A. GANDY, Individually and as Administrator of the Estate of David Charles Gandy, Deceased, Plaintiff - Appellant, v. NEAL PATRICK ROBEY, c/o Stafford County Sheriff's Office; JOHN DOES 1-25; JANE DOES 1-25; JOSEPH D. PITTMAN, Defendants - Appellees, and CHARLES E. JETT, c/o Stafford County Sheriff's Office; COMMONWEALTH OF VIRGINIA, Defendants.**

No. 11-2248

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*520 Fed. Appx. 134*; *2013 U.S. App. LEXIS 6817*

**October 24, 2012, Argued
April 4, 2013, Decided**

**NOTICE:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Motion denied by *Gandy v. Virginia, 2013 U.S. Dist. LEXIS 182855 (E.D. Va., Aug. 30, 2013)*

**PRIOR HISTORY:** [**1]
   Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. (1:10-cv-00065-LMB-TCB). Leonie M. Brinkema, District Judge.
*Gandy v. Robey, 2011 U.S. Dist. LEXIS 157964 (E.D. Va., May 16, 2011)*

**DISPOSITION:**    AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

**COUNSEL:** ARGUED: Peter Christopher Grenier, BODE & GRENIER, LLP, Washington, D.C., for Appellant.

Jeff W. Rosen, PENDER & COWARD, PC, Virginia Beach, Virginia; Robert R. Musick, THOMPSON MCMULLAN PC, Richmond, Virginia, for Appellees.

ON BRIEF: Andre M. Gregorian, BODE & GRENIER, LLP, Washington, D.C., for Appellant.

Robert A. Dybing, THOMPSON MCMULLAN PC, Richmond, Virginia, for Appellee Joseph D. Pittman.

**JUDGES:** Before TRAXLER, Chief Judge, KEENAN, Circuit aJudge, and R. Bryan HARWELL, United States District Judge for the District of South Carolina, sitting by designation.

**OPINION**

   [*136]  PER CURIAM:

   Terry A. Gandy ("Terry") brought this action under *42 U.S.C. § 1983* alleging that Sergeant Joseph D. Pittman and Deputy Sheriff Neal P. Robey of the Stafford County, Virginia, Sheriff's Office ("SCSO") used constitutionally excessive force in the shooting death of her husband David Gandy ("Gandy"). Terry also asserted wrongful death claims against Sergeant Pittman and Deputy Robey under Virginia law. The district court [**2] granted Sergeant Pittman's motion for summary judgment on both the *§ 1983* and the wrongful death claims.

   The court denied Deputy Robey's summary judgment

motion, however, and Terry's claims against him proceeded to trial. The jury answered special interrogatories, concluding that Deputy Robey used excessive force against Gandy, but that Deputy Robey "had a reasonable belief" that Gandy "posed an imminent threat of causing death or serious bodily injury" to himself or others. Based on the jury's responses, the district court concluded Deputy Robey was entitled to qualified immunity and entered judgment in his favor on the § 1983 claims. As for the wrongful death claims against Deputy Robey, the jury returned a defense verdict.

Terry appeals on several grounds. We affirm the order of the district court granting summary judgment to Sergeant Pittman but vacate the district court's entry of judgment in favor of Deputy Robey and remand Terry's excessive force claim against Deputy Robey for a new trial.

I.

A.

On June 29, 2008, following an argument with his son Matthew, Gandy told his wife Terry that he was going to get a gun from his neighbor Jordan Von Schwanitz and kill himself. Gandy told [**3] Von Schwanitz that he "was having a problem out back" and needed a gun. J.A. 528. Von Schwanitz gave him a loaded Sig Sauer 380. That evening, Terry saw Gandy sitting at a table in their basement with a holstered gun in front of him. Terry tried to grab the gun from the table, but Gandy pulled it away and went into the backyard with the gun and a beer. Both Terry and Von Schwanitz followed Gandy outside and pleaded for him to turn over the gun, but Gandy refused. During this time, Gandy was seated on a brick retaining wall a short distance from the door to the basement; Terry could not see the gun but assumed it was behind him.

Terry called Matthew and asked him to come home, explaining that Gandy was in possession of a gun and was threatening suicide. Matthew returned and went into the backyard to talk with his father and Von Schwanitz, who was still trying to convince Gandy to give up the gun. Like Terry, Matthew did not see the gun but assumed it was behind Gandy because Gandy kept putting his hand behind his back.

Shortly before 11:00 p.m., Matthew called 911. He told the dispatcher that Gandy had a gun and was in the backyard with Von Schwanitz and Terry, and that Gandy was upset [**4] following a family argument earlier in the day. Matthew further revealed that Gandy was a nightly drinker, struggled with anger issues, and was under a doctor's care for psychological difficulties. Matthew also indicated that Gandy was taking "quite a bit of medication." [*137] J.A. 746. He advised that authorities should approach with caution and that if Gandy saw or heard police officers, he would shoot himself.

The dispatcher sent officers to the scene based on the information Matthew provided during his 911 call. Sergeant Pittman responded to the scene along with Deputies Robey, Ed McCollough and Brian Davis. Sergeant Pittman was the shift supervisor and ranking law enforcement officer present. He concluded that the situation was highly dangerous and that immediate action was required to protect Gandy and the others with him. Sergeant Pittman considered calling for the SWAT Team, but he rejected that option because he feared it would take too long for SWAT to deploy. He also rejected the option of calling in a hostage negotiator, given Matthew's admonition that Gandy might shoot himself if he saw or heard any police officers.

According to Matthew, when the law enforcement officers arrived [**5] at the Gandy house, Matthew explained to Sergeant Pittman that Gandy was calm. Nonetheless, Sergeant Pittman went forward with his immediate action plan pursuant to which Sergeant Pittman and Deputy McCullough would enter the backyard rapidly to surprise Gandy, announce themselves and, if Gandy failed to surrender immediately, subdue him using tasers. Deputy Robey's assignment was to carry his M-4 rifle and provide deadly force if warranted. Sergeant Pittman did not specifically direct Deputy Robey when and under what circumstances to use deadly force. He assumed that Deputy Robey, with whom he had worked for more than a year, understood that SCSO policy permitted an officer to use deadly force in the face of a threat involving the risk of serious bodily harm or death to the officer or others. Deputy Davis was to serve as Deputy Robey's backup in the event lethal force was required and Deputy Robey was unable to act.

As planned, the officers entered Gandy's backyard through the privacy fence gate. According to Sergeant Pittman, he loudly announced "Sheriff's Office. Let me

see your hands. Drop the gun. Drop the gun." J.A. 403. Almost immediately after entering, both Sergeant Pittman [**6] and Deputy McCullough fired their tasers at Gandy, who was seated near the gate on a brick retaining wall. Both attempts were unsuccessful. The officers then shouted "Drop your gun," but Gandy ran toward a door in the rear of the house. It appeared to Deputy Robey that Gandy had a gun in his left hand and was reaching for the door with his right hand. According to Deputy Robey, Gandy looked towards him and raised his left hand in the direction of Deputy Robey and McCullough. Believing that Gandy was about to shoot either him or McCullough, Deputy Robey fired and struck Gandy three times--once on the left side of the chest, once on the left side of his back, and once on the right side of his back. Gandy fell forward through the door into the basement and came to rest on his stomach. Officers removed Terry, Matthew, and Von Schwanitz from the scene and then examined Gandy. Sergeant Pittman and Deputy Davis recovered the Sig Sauer 380, still holstered, from under Gandy's torso. Deputy McCollough testified that he saw the gun under Gandy as well. Sergeant Pittman indicated in a post-incident debriefing that he noticed a significant amount of blood pooling under Gandy's upper chest where [**7] he had an exit wound, but subsequent tests revealed no blood on the gun.

The civilian witnesses, however, presented a dramatically different version of the officers' conduct. According to Matthew, Terry and Von Schwanitz, the officers did [*138] not announce themselves when entering the backyard. Terry and Von Schwanitz conceded that the officers yelled "drop the gun," but they claim the officers did so only after having fired their tasers. All three witnesses claimed that Gandy was shot immediately after the officers ordered him to drop the gun and deny that Gandy had time to glance, turn his body, or raise his arm in Deputy Robey's direction.

B.

Terry filed this action under *42 U.S.C. § 1983* alleging that Deputy Robey used constitutionally excessive force in shooting and killing Gandy and that Sergeant Pittman is also liable for the use of such force on Gandy. Terry also asserted a wrongful death claim under Virginia law, alleging that the conduct of Sergeant Pittman and Deputy Robey was willful and wanton or at least grossly negligent. Both defendants moved for summary judgment. The district court granted summary judgment to Sergeant Pittman, concluding that he was entitled to qualified immunity [**8] because his discretionary tactical decision was reasonable under the circumstances. The district court denied summary judgment to Deputy Robey, however, concluding that there was a genuine issue of fact as to whether Gandy turned and raised his arm toward Deputy Robey. The district court explained that

> if you believe the testimony of the Gandy family members and if you believe the forensic experts that the plaintiffs have presented, [who] painted a picture in which it's dark, Mr. Gandy is running towards the house, his back is to the officer, and he does not turn to the officer to threaten him or McCullough[,] . . . there would be no proper justification for Robey to have fired at Mr. Gandy . . . .
>
> . . .
>
> . . . [T]here is evidence through the testimony of the family members who say that Gandy's left hand was never pointing towards the officers, [and] that he was running towards the door . . . .

J.A. 1070-71.

The claims against Deputy Robey thus proceeded to trial. Following the presentation of evidence, the district court instructed the jurors that "[a] law enforcement officer has the right to use such force as is necessary under the circumstances," and that "[w]hether the force used was [**9] reasonable or unreasonable is a question to be determined by [the jury] in light of all of the evidence received in this case." J.A. 1208. The district judge further explained to the jury the following:

> You must determine the degree of force that a reasonable and prudent police officer would have applied under the facts and circumstances shown from the evidence . . . . In determining whether or not Deputy Robey used excessive force, you may consider the extent of the injury suffered, the need for application of force, the relationship between the need and the amount of force used, the threat

520 Fed. Appx. 134, *138; 2013 U.S. App. LEXIS 6817, **9

reasonably perceived by Deputy Robey, and any efforts made to temper the severity of a forceful response.

. . .

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight . . . [and] must allow for the fact that police officers are often forced to make split-second judgments under circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

This reasonableness inquiry is an objective one. The question is whether Deputy Robey's actions were **[\*\*10]** objectively **[\*139]** reasonable in light of the facts and circumstances confronting him without regard to his underlying intention or motivation.

J.A. 1208-09.

The district court then gave the jury a special verdict form, to which Terry agreed. The jury answered these special interrogatories as follows:

> 1. Has the plaintiff, Terry A. Gandy, established by a preponderance of the evidence that defendant Neal Patrick Robey was grossly negligent in the performance of his duties when he shot David Charles Gandy?
>
> Answer: No
>
> 2. Has the plaintiff, Terry A. Gandy, established by a preponderance of the evidence that defendant Neal Patrick Robey engaged in willful and wanton misconduct and with conscious disregard when he shot David Charles Gandy?
>
> Answer: No
>
> 3. Has the plaintiff, Terry A. Gandy, established by a preponderance of the evidence that defendant Neal Patrick Robey violated David Charles Gandy's *Fourth Amendment* right to be free from excessive use of force, or his *Fourteenth Amendment* [right] not to be deprived of life without due process of law, when he shot David Charles Gandy?
>
> Answer: Yes
>
> 4. Do you find that at the time that he shot David Charles Gandy, Deputy Neal Patrick Robey had a reasonable belief **[\*\*11]** that Mr. Gandy posed an imminent threat of causing death or serious bodily injury to Deputy Robey or to other persons present at the scene?
>
> Answer: Yes

J.A. 961-62. The jury awarded Terry $267,000 in compensatory damages but did not award punitive damages. The parties declined the district court's invitation to have the jury polled, and the court discharged the jurors.

Immediately after dismissing the jury, the district court set aside the jury's verdict awarding compensatory damages to Terry on her *§ 1983* claim. The district court explained that because the jury found that Deputy Robey "had a reasonable belief that Mr. Gandy posed an imminent threat of causing death or serious bodily injury to Deputy Robey or to other persons present at the scene," J.A. 962, he was entitled to qualified immunity. The district court concluded it was compelled to set aside the verdict, and Terry did not object. [1]

[1] The district court stated the following:

> There is a legal inconsistency to some degree in this verdict in that . . . the jury . . . answer[ed] "yes" to the 1983 [question], but they also answered "yes" to question No. 4, which is clearly the factual predicate finding as to liability on the 1983 **[\*\*12]** matter, that is, whether or not the officer would be entitled to qualified immunity. That question we've all agreed pertained to that issue.

> . . . I do believe that the Court is required under [these] findings to set aside this verdict, and I think [plaintiff's counsel is] acknowledging that with the nodding of [his] head and the body language . . . .
>
> . . .
>
> Anything further we need to address at this time?
>
> [PLAINTIFF'S COUNSEL]: No, Your Honor.

J.A. 1240-41.

Following trial, Terry obtained new counsel who then moved to alter or amend the judgment and reinstate the jury award. Terry contended that the special verdict form, to which she did not object at trial, was flawed in that it incorrectly stated a subjective qualified immunity standard and that it was drafted in such a way as to permit the jury to award damages even if it answered "yes" to the qualified [*140] immunity question. She argued that the only reasonable way to harmonize the jury's apparently inconsistent answers was for the district court to reinstate the jury's award of damages or order a new trial altogether. The district court denied the motion to alter or amend the judgment, and this appeal ensued.

II.

Terry's fundamental claim [**13] is that Sergeant Pittman and Deputy Robey used constitutionally excessive force against Gandy that resulted in his death. The *Fourth Amendment* guarantees the "right to be free from unreasonable searches and seizures, which encompasses the right to be free of arrests, investigatory stops, or other seizures effectuated by excessive force." *Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)*; see *Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*. 2 Whether a law enforcement officer used excessive force depends on the "objective reasonableness" of the action in question. *Graham, 490 U.S. at 388* (internal quotation marks omitted). The force used by an officer is not excessive if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id. at 397*; *Schultz, 455 F.3d at 477*. "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994)*. The use of deadly force is constitutionally reasonable "[w]here the officer has probable cause [**14] to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*.

> 2   Terry also challenges the dismissal of her excessive force claim under the *Due Process Clause of the Fourteenth Amendment*. This challenge is without merit. "The *Fourth Amendment* governs claims of excessive force during the course of an arrest, investigatory stop, or other seizure of a person." *Riley v. Dorton, 115 F.3d 1159, 1161 (4th Cir. 1997)* (en banc) (internal quotation marks omitted)). The *Fourteenth Amendment*, by contrast, provides the framework for deciding the excessive force claims of arrestees or pretrial detainees. See *Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008)*.

Civil liability, however, does not automatically attach to every constitutional violation. Government officials are entitled to qualified immunity as a matter of law so long as they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. In other words, courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in [**15] the situation he confronted." *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. Qualified immunity extends to government officials' objectively reasonable mistakes, "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* (internal quotation marks omitted). "[T]he immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland, 41 F.3d at 173*.

Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for **[*141]** decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his perceptions of the objective facts of the incident in question are.

Id. (citations omitted). The qualified immunity defense "protects all but the plainly **[**16]** incompetent or those who knowingly violate the law," and it "protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005)* (citation and internal quotation marks omitted).

With these principles in mind, we consider Terry's specific challenges to the district court's rulings.

III.

Terry raises several challenges to the district court's entry of summary judgment in favor of Sergeant Pittman. We briefly address them below.

A.

Terry first contends that Sergeant Pittman violated Gandy's *Fourth Amendment* rights when he fired his taser at Gandy. We disagree. For a plaintiff to prevail on an excessive-force claim under the *Fourth Amendment*, there must first have been a seizure. See *County of Sacramento v. Lewis, 523 U.S. 833, 843-45, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 & n.7 (1998)*. "[A] *Fourth Amendment* seizure requires 'an intentional acquisition of physical control' which occurs 'only when there is a governmental termination of freedom of movement through means intentionally applied.'" *Melgar v. Greene, 593 F.3d 348, 354 (4th Cir. 2010)* (quoting *Brower v. Cnty. of Inyo, 489 U.S. 593, 596-97, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)* (emphasis **[**17]** omitted)). Thus, no seizure occurs when a law enforcement officer shoots at a fleeing suspect but fails to hit him and halt his movement. See, e.g., *Cameron v. City of Pontiac, 813 F.2d 782, 785 (6th Cir. 1987)*. Because it is uncontroverted that Sergeant Pittman missed Gandy when firing his taser, Terry's claim clearly fails. See *Lewis, 523 U.S. at 845 n.7* ("Attempted seizures of a person are beyond the scope of the *Fourth Amendment*.").

B.

Next, Terry contends that even if Sergeant Pittman did not personally use excessive force directly on Gandy, his conduct nevertheless effectively caused the deprivation of Gandy's *Fourth Amendment* rights. See *Sales v. Grant, 158 F.3d 768, 776 (4th Cir. 1998)* (applying the "principle of effective causation by indirect means" in a *§ 1983* action alleging *First Amendment* violations in the public employment context). Under an effective causation theory, the "requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Id. (quoting *Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 560-61 (1st Cir. 1989))*. Thus, Terry **[**18]** argues that Sergeant Pittman is liable for formulating a plan that "set in motion" a series of events that Sergeant Pittman knew or should have known would cause the other officers to use constitutionally excessive force against Gandy. Terry argues, moreover, that Sergeant Pittman's plan to taser Gandy without first trying to calm him down by communicating with him or trying other less drastic measures was unreasonable and in violation of various police training procedures.

**[*142]** Terry's "effective causation" or "setting-in-motion" theory strikes us as highly dubious in the excessive force context. In determining whether an officer was justified in using deadly force based on "probable cause to believe that the suspect pose[d] a threat of serious physical harm," *Garner, 471 U.S. at 11*, we must focus on the moment when such force was employed. See *Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)* ("Graham requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force."); *Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir. 1992)* ("[P]re-seizure conduct is not subject to *Fourth Amendment* scrutiny."). A police **[**19]** officer's pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an

excessive force claim under the *Fourth Amendment* which looks only to the moment force is used. See *Greenidge v. Ruffin, 927 F.2d 789, 791 (4th Cir. 1991)* (explaining that "evidence of the officer's alleged violation of police procedures immediately preceding the arrest" was irrelevant to whether officer's use of deadly force was constitutionally excessive). Thus, the mere decision itself to make a surprise entry as opposed to other alternatives affords no basis for liability against Sergeant Pittman. Additionally, there is no evidence that Sergeant Pittman ordered Deputy Robey to shoot Gandy or intended him to do so regardless of circumstances. Since a *Fourth Amendment* seizure requires "an intentional acquisition of physical control," *Melgar v. Greene, 593 F.3d at 354* (emphasis added) (internal quotation marks omitted), Terry cannot rely on Sergeant Pittman's pre-seizure plan to establish her excessive force claim.

Moreover, even if this theory is viable in the excessive force context, we agree with the district court that Sergeant **[**20]** Pittman's decision to employ a quick, dynamic entry that he believed would permit the officers to subdue Gandy with non-lethal force was reasonable under the circumstances. Sergeant Pittman's plan--adopted after considering and rejecting several other alternatives--was a thoughtful approach that took into account the specific risk factors known to exist, particularly that Gandy was armed and had threatened to kill himself if he saw or heard the police. The aim of the plan was to surprise and subdue Gandy before he could harm himself or others. There was nothing before the district court to suggest that Sergeant Pittman knew or should have known that the course of action he chose would in fact lead to the use of deadly force against Gandy. In sum, we conclude that this theory was properly rejected at the summary judgment stage.

C.

Terry also contends the district court should have permitted her excessive force claim against Sergeant Pittman to go to trial on a theory of supervisory liability. "[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)*. To succeed on **[**21]** a supervisory liability claim under *§ 1983*, a plaintiff must establish

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit **[*143]** authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id. at 799*. "Establishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Id. (internal quotation marks omitted). Terry has not identified what evidence, if any, she proffered to show that Sergeant Pittman's subordinates were engaged in widespread unconstitutional conduct by using lethal force under circumstances where the suspect posed no threat or that he was aware but deliberately **[**22]** indifferent to such conduct. Therefore, no triable issue was created on Terry's supervisory liability theory.

D.

Finally, Terry challenges the district court's entry of summary judgment against her on the state law tort claims alleging wrongful death as a result of Sergeant Pittman's gross negligence or willful and wanton conduct. The district court concluded that on the evidence before it, as a matter of law "there [was] no standard of care that's been violated" by Sergeant Pittman. J.A. 1069. On appeal, Terry contends that Sergeant Pittman was at least grossly negligent when he instructed Deputy Robey to shoot Gandy if the tasers were ineffective or it otherwise became necessary to do so.

We disagree. Under Virginia law, gross negligence is "the utter disregard of prudence amounting to complete neglect of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Chapman v. City of Va.*

*Beach*, 252 Va. 186, 475 S.E.2d 798, 800-01 (Va. 1996) (emphasis added) (citation and internal quotation marks omitted). Unquestionably, Sergeant Pittman exercised at least some care **[**23]** in designing a plan that was intended to permit the officers to disable Gandy and protect others (and Gandy himself) using non-lethal force. As the district court concluded in granting summary judgment on Terry's *§ 1983* excessive force claim, in light of the facts and circumstances known to Sergeant Pittman at the time, his plan to respond was reasonable. Thus, we cannot conclude that a jury question existed as to whether Sergeant Pittman exercised even slight diligence in formulating his plan to ensure that Gandy hurt neither himself nor others. That Sergeant Pittman's plan failed--in the sense that lethal force was in fact used--does not mean that the plan was unreasonable.

IV.

Terry also challenges the district court's entry of judgment in favor of Deputy Robey. Although Terry's argument is not entirely clear, the thrust of it is that: (1) special interrogatory #4 did not incorporate the proper qualified immunity standard; and (2) even if it did incorporate the proper standard, the jury's response to special interrogatory #4 was inconsistent with and could not trump its response to special interrogatory #3 that Deputy Robey violated Gandy's *Fourth Amendment* right to be free of the use **[**24]** of excessive force or the jury's concomitant award of damages.

A.

Terry contends that the language used by the district court in special interrogatory **[*144]** #4 improperly directed the jury to determine the reasonableness of Deputy Robey's conduct under a subjective rather than objective standard. Although Terry now takes exception to the substance of special interrogatory #4, she failed to do so at trial. In fact, Terry's trial counsel actually agreed to the district court's proposed language:

> THE COURT: I'm more concerned about question 4. I think that is all that's needed for the qualified immunity.
>
> [DEFENSE COUNSEL]: Yeah, I think -
>
> [PLAINTIFF'S COUNSEL]: We agree.
>
> [DEFENSE COUNSEL]: I think that's on target.

J.A. 1122. By specifically affirming the district court's qualified immunity special interrogatory, Terry's counsel arguably invited the district court to use the very language Terry now challenges on appeal, which would render this issue unreviewable on appeal. See, e.g., *United States v. Bennafield*, 287 F.3d 320, 325 (4th Cir. 2002) (recognizing that invited errors are necessarily waived errors that are not reviewable on appeal).

Out of an abundance of caution, however, we will review **[**25]** the substance of special interrogatory #4 for plain error. See *In re Celotex Corp.*, 124 F.3d 619, 631 (4th Cir. 1997) (adopting plain error review framework under *United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)*, in the civil context). Terry bears the substantial burden of demonstrating that (1) there is an error; (2) the error is plain; (3) the error affects the appellant's substantial rights; and (4) the error affects the fairness, integrity or public reputation of judicial proceedings. See *Olano, 507 U.S. at 732-37*.

We conclude that Terry's challenge falters on the first prong. Terry contends that special interrogatory #4 "went only to the subjective belief of Robey, and thus [asked the jury to make] a finding [not] pertinent to qualified immunity." Brief of Appellant at 49. Terry contends the district court should have asked the jury to determine whether "a reasonable officer on the scene" would have believed that Gandy posed an imminent deadly threat rather than whether "Robey had a reasonable belief" that Gandy posed such a threat. Id. According to Terry, the language used by the court improperly asked the jury to determine Deputy Robey's subjective state of mind.

We disagree. Although **[**26]** the special interrogatory itself did not expressly ask whether "a reasonable officer" would have perceived an imminent threat of grave danger from Gandy or whether such a perception was "objectively reasonable," the district court's jury charge as a whole made abundantly clear that the inquiry is objective not subjective. Terry would have us divorce the special interrogatory from the context of the accompanying jury instructions issued by the district court. As we have often observed, however, "we do not view a single instruction in isolation; rather we consider

whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Rahman, 83 F.3d 89, 92 (4th Cir. 1996)*. Similarly, "jury interrogatories are considered in conjunction with the general jury charge to determine if the interrogatories adequately presented the contested issues to the jury." *Sikes v. Gaytan, 218 F.3d 491, 493 (5th Cir. 2000)* (internal quotation marks omitted). Because the court's instructions as a whole repeatedly conveyed the idea that the relevant inquiry was an objective one, we reject [*145] this argument. 3

> 3   For the same reasons, [**27] we also reject Terry's argument that the form of special interrogatory #4 constituted plain error because it did not include its own burden of proof instruction. In charging the jury, the district court explained that Deputy Robey denied that he employed excessive force "because under the facts and circumstances confronting him when he shot Mr. Gandy, he had a reasonable belief that Mr. Gandy posed an imminent threat of death or serious physical injury to himself or others" and that "Deputy Robey has the burden of proving the reasonableness of that belief by a preponderance of the evidence." J.A. 1201-02.

B.

Finally, Terry contends that she is entitled to a new trial under *Rule 49 of the Federal Rules of Civil Procedure* which governs issues relating to special verdicts and general verdicts with answers to written questions. The Rule specifies in *subsection (b)(4)* that "[w]hen the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial." *Fed. R. Civ. P. 49(b)(4)*. Terry asserts that the jury's response [**28] to special interrogatory #4 was inconsistent with both its response to special interrogatory #3 that Deputy Robey violated Gandy's *Fourth Amendment* right to be free of the use of excessive force and its concomitant award of damages. For the following reasons, we agree and are constrained to remand Terry's excessive force claim against Robey for a new trial.

The district court submitted interrogatories #3 and #4 to the jury in an effort to sort out the question of qualified immunity. Under the approach established in Saucier, analysis of a qualified immunity claim involves a two-step procedure "that asks first whether a constitutional violation occurred and second whether the right violated was clearly established." *Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011)* (en banc) (internal quotation marks omitted)). 4 As previously suggested, the district court intended interrogatory #3 to resolve the first question of whether Robey committed a constitutional violation by asking the jury:

> Has the plaintiff, Terry A. Gandy, established by a preponderance of the evidence that defendant Neal Patrick Robey violated David Charles Gandy's *Fourth Amendment* right to be free from excessive use of [**29] force, or his *Fourteenth Amendment* [right] not to be deprived of life without due process of law, when he shot David Charles Gandy?

J.A. 961 (emphasis added). The jury answered "yes" to this question. In interrogatory #4, which the district court intended to resolve the second question of whether Robey was entitled to qualified immunity despite the constitutional violation, the jury was asked:

> Do you find that at the time that he shot David Charles Gandy, Deputy Neal Patrick Robey had a reasonable belief that Mr. Gandy posed an imminent threat of causing death or serious bodily injury to Deputy Robey or to other persons present at the scene?

[*146] J.A. 962 (emphasis added). The jury answered "yes" to this question as well, but then reached a general verdict in Terry's favor, awarding her $267,000 in compensatory damages.

> 4   Terry argues that the Supreme Court overruled Saucier's two-part test and made the qualified immunity and constitutionally excessive force inquiries identical in *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. It most certainly did not. Pearson abrogated *Saucier* only to the extent that Saucier made it mandatory for courts to follow the two-step procedure in order--courts may now address [**30] the Saucier prongs in any order at their discretion. See *Pearson, 555 U.S. at 236*.

In responding affirmatively to special interrogatory #3, the jury concluded as a factual matter that Deputy Robey's act of shooting David constituted excessive force, in violation of the *Fourth Amendment*. This finding is inconsistent with the jury's answer to special interrogatory #4, in which the jury concluded that Deputy Robey had a reasonable belief that David posed an imminent threat of causing death or serious bodily injury to persons present at the scene of the incident.

The inconsistency between the answers to these two questions is apparent because the factual question presented in interrogatory #4, whether Deputy Robey reasonably believed that David posed a threat of imminent harm, is a core component of the issue addressed by special interrogatory #3, namely, whether the force employed by Deputy Robey was excessive. As the Supreme Court held in *Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*, an analysis of the reasonableness of a particular use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect [**31] poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id. at 396* (emphasis added). This court, too, has made clear that the question of whether a suspect posed an immediate threat of harm to an officer is a factor relevant to the analysis of an excessive force claim under the *Fourth Amendment*. See *Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005)* (holding that officers were not entitled to judgment as a matter of law on merits of underlying excessive force claim because "a reasonable jury could conclude . . . that a perception by the officers that [plaintiff] posed a threat of serious physical harm to them would have been unreasonable," but nonetheless awarding qualified immunity because the unconstitutionality of the officers' conduct was not clearly established); *Jones v. Buchanan, 325 F.3d 520, 529 (4th Cir. 2003)* (concluding that an excessive force claim survived summary judgment because, under the factors set forth in Graham, "[a] fact finder could conclude that [the] evidence demonstrates that [the suspect] posed no immediate threat to anyone before [law enforcement] entered [**32] the processing room and used force"); *Gray-Hopkins v. Prince George's County, Md., 309 F.3d 224, 231 (4th Cir. 2002)* (affirming denial of qualified immunity where, "[b]ased on the plaintiff's version of the events giving rise to this case, . . . he was not posing a threat to the safety of the officers or others. . . . [A] trier of fact could clearly conclude that a *Fourth Amendment* violation occurred").

Accordingly, the factual question of whether an individual poses a threat of danger is a component of, and is subsumed by, the broader question of whether the officer's use of force to seize an individual was excessive in violation of the *Fourth Amendment*. Unfortunately, special interrogatories #3 and #4 permitted the jury to answer these interrelated questions in an inconsistent manner. According to the jury, Deputy Robey reasonably believed that David posed an imminent threat of serious harm, yet the jury concluded that Deputy Robey used excessive force in preventing David from carrying out such a threat of harm.

In addition to being inconsistent with each other, of course, these interrogatory answers are inconsistent with the general [*147] verdict awarding Terry $267,000 in compensatory [**33] damages. Despite its conclusion that Robey reasonably perceived an immediate threat from Gandy, it awarded damages as a result of his conduct. These inconsistencies implicate *Fed. R. Civ. P 49(b)(4)* and leave us no choice but to remand for a new trial.

V.

For these reasons, we affirm the order of the district court granting summary judgment to Sergeant Pittman but vacate the district court's entry of judgment in favor of Deputy Robey and remand Terry's excessive force claim against Deputy Robey for a new trial and other proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED