# Exhibit 14



**JOHN COOK, III, Individually, and as Administrator for the Estate of John Gideon Cook, IV; PATRICIA COOK; LINDA HAMMOND, parent and Guardian Ad Litem for Minor J.A.C.; DENISE BROWN, parent and Guardian Ad Litem for Minor J.C., Plaintiffs - Appellants, v. RAYMOND A. HOWARD, police officer (ID#C646); DWAYNE GREEN, police officer (ID#G716); BALTIMORE POLICE DEPARTMENT; FREDERICK H. BEALEFELD, Commissioner, Baltimore City Police Department; JOHN BEVILAQUA, Colonel, Defendants - Appellees, and CITY OF BALTIMORE; JOHN DOES 1-100, Defendants.**

No. 11-1601

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*484 Fed. Appx. 805*; *2012 U.S. App. LEXIS 18053*

**May 16, 2012, Argued**
**August 24, 2012, Decided**

**NOTICE:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** US Supreme Court certiorari denied by *Cook v. Howard, 2013 U.S. LEXIS 2306 (U.S., Mar. 18, 2013)*

**PRIOR HISTORY:** **[**1]**
Appeal from the United States District Court for the District of Maryland, at Baltimore. (1:10-cv-00332-JFM). J. Frederick Motz, Senior District Judge.
*Cook v. Howard, 2011 U.S. Dist. LEXIS 57165 (D. Md., May 27, 2011)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: Olugbenga Olatokumbo Abiona, Philadelphia, Pennsylvania, for Appellants.

William Rowe Phelan, Jr., Glenn Todd Marrow, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

ON BRIEF: George A. Nilson, City Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

**JUDGES:** Before AGEE and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge. Judge Diaz wrote an opinion dissenting in part and concurring in part.

**OPINION**

**[*806]** PER CURIAM:

John Cook, III, individually and as administrator of the estate of John Cook, IV ("Cook"), and various members of the Cook family (collectively "the Appellants"), appeal from the district court's judgment against them on their claims against the Baltimore City Police Department ("BCPD") and several BCPD officers.[1] **[*807]** The Appellants alleged claims pursuant to *42 U.S.C. §§ 1983* and *1985* for violations of the *Fourth* and *Fourteenth Amendments* arising from Cook's death. They also sought to recover damages under Maryland's wrongful death and survival statutes. The Appellants appeal numerous **[**2]** decisions of the district court that resulted in the adjudication of all of

their claims in favor of the BCPD and the BCPD officers. For the following reasons, we affirm the judgment of the district court.

> 1   The Appellants consist of Cook's mother and father (John Cook, III) as well as the mothers of Cook's two minor children (as parents and guardians ad litem for those children) and Cook's Estate.

I. Facts and Relevant Proceedings Below

A. Preliminary Factual Allegations

The light in which we review the facts varies based on the stage of the proceedings at which the claims were resolved. For claims dismissed at the motion to dismiss stage, we must accept as true the well-pled facts in the complaint, viewed in the light most favorable to the plaintiff. *Brockington v. Boykins, 637 F.3d 503, 505 (4th Cir. 2011)*. For the claims resolved at the summary judgment stage, we review the entire record before us in the light most favorable to the non-moving party. *Merchant v. Bauer, 677 F.3d 656, 658 n.1 (4th Cir. 2012)*.

A straight-forward recitation of the Appellants' allegations is complicated by changes made to those allegations as the case proceeded. Those changes alter which defendant or third [**3] party is purported to have engaged in certain conduct. At times the allegations directly contradict each other. Far more troubling, the Appellants persist in asserting facts and conduct that lack any basis in the record or that are directly contradicted by undisputed evidence in the record developed during discovery. To say that the operative pleading (the amended complaint) and the opening brief are poorly drafted is to be generous. Consequently, we will initially provide only a brief overview of the factual allegations behind the Appellants' claims.

The allegations as pled are: On the afternoon of August 14, 2007, Cook, an African-American, came into proximity of two BCPD plain-clothed officers who were on patrol in a Baltimore neighborhood. As the officers approached Cook, they did not identify themselves, and Cook, "[a]fraid for his life," fled on foot. (J.A. 76.) The officers pursued him. During the course of the foot pursuit and subsequently alleged events, additional BCPD officers responded to a request for assistance.

To evade the officers, Cook jumped over a chain-link fence and hung onto the other side. The fence runs above a highway, and the distance from the small concrete [**4] ledge at the base of the fence to the highway is approximately seventy feet. One or more BCPD officers is alleged to have shaken the fence with sufficient force to cause Cook to lose his grip. Cook fell first to the concrete ledge, which he hung from briefly before falling onto the highway. Cook survived the initial impact, but within moments of landing on the highway, a vehicle ran over him, and he died at the scene. After Cook's death, BCPD officers at the fence were alleged to have high fived, laughed, and referred to Cook using the "N" word. BCPD officers are then alleged to have conspired to cover up the circumstances surrounding Cook's death by, among other things, conducting an inadequate investigation and filing false reports related to his death.

B. The Amended Complaint

In February 2010, the Appellants filed this action in the District Court for the District of Maryland. The amended complaint (which is the operative pleading for [*808] all issues on appeal) was brought against the BCPD; BCPD Commissioner Frederick Bealefeld, the highest ranking officer in the BCPD; BCPD Colonel John Bevilaqua, the Chief of the BCPD detective division; BCPD Officers Raymond A. Howard and Dwayne Green; [**5] and "Defendants John Does 1-100."[2] (J.A. 70-71.)

> 2   Several spellings of "Bevilaqua" and "Bealefeld" appear in the briefs and record; for consistency, we use the spellings on the docket sheet.

The amended complaint alleged five counts: Counts I and III set forth claims under *42 U.S.C. §§ 1983* and *1985* against the BCPD, Commissioner Bealefeld, and Colonel Bevilaqua for violations of the *Fourth* and *Fourteenth Amendments* with respect to the events surrounding Cook's death. The amended complaint asserted that the BCPD was liable for the conduct of its officers and that its customs, practices, and policies encouraged BCPD officers to violate the constitutional rights of citizens, including Cook. Commissioner Bealefeld and Colonel Bevilaqua (collectively the "supervisory officials") were sued under a theory of supervisory liability for the events surrounding Cook's death. Although the amended complaint is unwieldy and difficult to parse, it also appears that these defendants, or at least Colonel Bevilaqua, were alleged to have violated Cook's

constitutional rights by conspiring to cover up the events surrounding his death.

The amended complaint identified Officers Howard and Green as the BCPD [**6] officers who initially approached Cook; it alleged that they engaged in an "unlawful" pursuit of Cook and then both shook the fence such that Cook fell from it. The amended complaint also alleged that Officer Howard did "most of the aggressive hitting of the fence that [Cook] hung on to," engaged in "high-fiving and laughing" following Cook's death, used racial epithets and inflammatory language, and engaged in a physical altercation with Officer Howard Bradley because of the epithets. Lastly, it asserted Officer Howard "filed a false incident report and covered up the actual events at the scene," and participated in a conspiracy to cover up the events surrounding Cook's death. (J.A. 77-78.) Based on these factual allegations against Officers Howard and Green, Count II set forth claims under *42 U.S.C. §§ 1983* and *1985* for violations of the *Fourth* and *Fourteenth Amendments*, and Counts IV and V alleged survival and wrongful death actions under Maryland state law.[3]

> 3    As noted, the amended complaint also designated "John Does 1-100" as defendants; however, none of the counts specifically referred to them.

C. Proceedings Below

The BCPD, Commissioner Bealefeld, and Colonel Bevilaqua moved to [**7] dismiss the claims against them (Counts I and III) under *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim. The district court granted the motion, concluding that the amended complaint did "not allege[] sufficient facts to establish liability under *Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978),*" and that the "conclusory allegations" were "clearly . . . insufficient under" the standards set by the Supreme Court in *Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. Lastly, it noted that the "only facts relating to the alleged conspiracy pertain to events that occurred after [Cook] was killed and therefore cannot, as a matter of causation, provide a basis for" the Appellants' claims. (J.A. 11.) The district court's grant of the 12(b)(6) motion disposed of all counts alleged [*809] against the BCPD and supervisory officers.

In the intervening months the Appellants and Officers Howard and Green engaged in discovery related to Counts II, IV, and V. Relevant to this appeal, the district court granted the BCPD's motion to quash a request for production of documents that the Appellants had served after the BCPD [**8] had been dismissed from the case. The court's order granted the motion based on its conclusion that "the documents sought by [the Appellants] are irrelevant to the claims that are now pending." (J.A. 18.)

After the scheduling order's deadline for making a motion to amend the complaint had passed, the Appellants moved to amend the pleadings in order to "substitute the names of [BCPD Officers] Jared Fried and Angela Choi for defendants John Does 1 and 2." (J.A. 19.) The district court denied the motion, concluding that the Appellants had not demonstrated good cause for the amendment.

Officers Howard and Green then moved for summary judgment on each claim against them. Upon consideration of the parties' arguments, the district court granted the motion. The court recognized remaining factual disputes in the record, but determined that none were "material" to resolving the issues in the case. Reviewing the *§§ 1983* and *1985* claims against Officers Howard and Green, the district court concluded that the facts did not support the Appellants' contention that they had violated either Cook's or the Appellants' *Fourth* or *Fourteenth Amendment* rights. The district court also held that the state law [**9] claims were barred because the Appellants failed to comply with the notice requirements of Maryland's Local Government Tort Claims Act, *Md. Code Ann., Cts. & Jud. Proc. Art. § 5-304(a)*.

The Appellants noted a timely appeal, and we have jurisdiction under *28 U.S.C. § 1291*.

II.

The [**10] Appellants raise numerous arguments that can be boiled down to four central issues, namely, whether the district court: (1) erred in granting the motion to dismiss Counts I and III because the allegations in the amended complaint were sufficiently pled; (2) abused its discretion in granting the motion to quash the request for production of documents by relying on an improper basis for its decision or, alternatively, by misapplying it; (3) abused its discretion in denying the motion to substitute Officers Fried and Choi because such motions should be

liberally granted and the Appellants had shown good cause to allow the amendment; and (4) erred in granting the motion for summary judgment as to Counts II, IV, and V because there remained numerous genuine issues of material fact for a jury to resolve and the forecasted evidence was such that a jury could have found in the Appellants' favor as to each remaining claim.

Having reviewed each of the parties' arguments and the record, we conclude that the district court did not commit reversible error in this case. We address below those arguments warranting further discussion and affirm the judgments of the district court.

A. *Rule 12(b)(6)* Dismissal **[**11]** of Counts I and III

The Appellants contend the district court erred in granting the motion to dismiss Counts I and III -- the *§§ 1983* and *1985* claims against the BCPD, Commissioner Bealefeld, and Colonel Bevilaqua -- for failure to state a claim. They assert that the district court improperly applied a heightened pleading standard beyond what **[*810]** is required under federal notice pleading. To advance their argument, the Appellants rely heavily on the Supreme Court's explanation of those principles in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*, and this Court's decision in *Jordan by Jordan v. Jackson, 15 F.3d 333 (4th Cir. 1994)*. They claim that dismissal was inappropriate because the amended complaint sufficiently alleged facts that, if proven with specific evidence following discovery, would show that the BCPD, Commissioner Bealefeld, and Colonel Bevilaqua could be held liable under *§§ 1983* and *1985* for the events surrounding Cook's death.

We review de novo a district court's *Rule 12(b)(6)* dismissal, "focus[ing] only on the legal sufficiency of the complaint," *Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)*, and "accepting as true **[**12]** the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff." *Brockington, 637 F.3d at 505*.

*Federal Rule of Civil Procedure 8(a)(2)* states that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Curiously, the Appellants make no attempt to demonstrate that it satisfied the Supreme Court's explanations of *Rule 8(a)(2)*'s requirements as set forth in Twombly and Iqbal, and which were the primary grounds

upon which the district court relied. Instead, they rely on pre-Twombly and Iqbal cases such as Leatherman and Jordan. While Leatherman held that *§ 1983* claims are not subject to a heightened pleading standard and Jordan applied that holding in this Circuit, claims brought in federal court are also subject to the generally applicable standards set forth in the Supreme Court's entire *Rule 8(a)* jurisprudence, including Twombly and Iqbal. As we have previously recognized, these later "decisions require more specificity from complaints in federal civil cases than was heretofore the case." *Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, 288 (4th Cir. 2012)*.

Pursuant to Twombly and Iqbal, **[**13]** a complaint will survive a motion to dismiss only if it contains factual allegations in addition to legal conclusions. Factual allegations that are simply "labels and conclusions, and a formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly, 550 U.S. at 555*. In addition, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id. at 570*. That is to say, the factual allegations must "be enough to raise a right to relief above the speculative level." *Id. at 555*. Instead, the allegations must be sufficient to "permit the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Iqbal, 556 U.S. at 679*. For these reasons, courts "need not accept the legal conclusions drawn from the facts [alleged in a complaint], and [they] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano, 521 F.3d at 302* (internal quotation marks omitted).

We agree with the district court that the amended complaint does not satisfy these requirements. The amended complaint suffers from a number of infirmities with respect to the claims against **[**14]** the BCPD. Most strikingly, it repeatedly sets forth legal conclusions masquerading as factual allegations. Indeed, at times, the amended complaint misstates what the law is with respect to Monell and supervisory liability, thus pleading not only legal conclusions as opposed to fact, but inaccurate legal conclusions at that. The district court appropriately did not credit those portions of the amended complaint. Just **[*811]** as troubling, the amended complaint parrots the language of various legal theories without stating any facts to demonstrate that type of conduct. In so doing, the amended complaint "tenders naked assertions devoid of further factual enhancement," *Iqbal, 556 U.S. at 678* (internal quotation marks, alterations, and citation

484 Fed. Appx. 805, *811; 2012 U.S. App. LEXIS 18053, **14

omitted), and is merely a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," which are not sufficient to survive a motion to dismiss. *Id. at 678* (citation omitted). Lastly, where the amended complaint alleges actual facts, those facts are either irrelevant to establishing a viable *§ 1983 or 1985* claim, or, where on point, do not "state[] a plausible claim for relief," *id. at 679*, because they do not "raise **[**14]** a right to relief above the speculative level." *Twombly, 550 U.S. at 555.*

With respect to Commissioner Bealefeld and Colonel Bevilaqua's liability as supervisory officers, the amended complaint's assertions boil down to contending that because Cook's death occurred at a time when they were supervisors of BCPD officers, they have imputed knowledge of their subordinates' conduct and should be held liable for it. Simply put, the amended complaint does not set forth facts that raise beyond the level of speculation any claim of entitlement to relief under *§ 1983 or 1985* founded on a theory of supervisory liability. See *Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)* (stating the three elements to establish supervisory liability).[4]

> 4 We also agree with the district court that even accepting the scant factual allegations of a conspiracy as true, the amended complaint simply does not set forth a viable cause of action for a conspiracy to violate Cook's rights by covering up the circumstances of his death given that the alleged conspiracy formed only after Cook died. Nor did Cook set forth facts sufficient to survive a motion to dismiss that would support the conclusion that any such conspiracy **[**16]** was motivated by race. Thus, those allegations could not implicate Cook's constitutional rights or set forth a basis for relief under *§ 1985* as a matter of law. See *Simmons v. Poe, 47 F.3d 1370, 1376-77 (4th Cir. 1995)* (stating the elements of a cause of action under *§ 1985(3)*).

For the reasons set forth above, we conclude the district court did not err in granting the BCPD and supervisory officials' motion to dismiss the claims against them.

**B. Motion to Quash and Motion to Substitute**

The Appellants next claim the district court abused its discretion in granting the BCPD's motion to quash a

request for production of documents and in denying a motion to substitute Officers Fried and Choi.[5] See *In re Grand Jury Subpoena, 646 F.3d 159, 164 (4th Cir. 2011)* (stating standard of review for a motion to quash); *US Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 320 (4th Cir. 2010)* (stating standard of review for a motion to amend a complaint).

> 5 The "motion to substitute the names of Jared Fried and Angela Choi for defendants John Does 1 and 2" sought to do much more than simply substitute these named parties for John Does. For this reason, it would more appropriately be termed a motion to **[**17]** file a second amended complaint and join party defendants. Nonetheless, the standard of review for each motion is the same; for consistency, we refer to it as the "motion to substitute."

**1. Motion to Quash**

After the BCPD had been dismissed from the case, the Appellants served it with a request for production of documents. The request encompassed a range of materials, from all materials relating to Cook's death to documents regarding BCPD officer training procedures, performance **[*812]** monitoring, and allegations of police misconduct from the general public. (J.A. 91-93.) The request set a compliance date of October 15.[6] (J.A. 91-93.)

> 6 Specifically, the request demanded that the BCPD "produce[] for inspection and photocopying the documents described below, at 10:00 a.m., Friday, October 15, 2010, at its headquarters . . . ." (J.A. 89.)

The BCPD moved to quash the request for production of documents, asserting that the vast majority of the documents requested were only relevant to the dismissed claims against the BCPD or were not discoverable under state privilege laws. It also indicated it would "produce non-privileged, non-disciplinary/personnel related responsive documents in its possession, **[**18]** custody, or control that pertain specifically to the facts and circumstances of the August 14, 2007 incident." (J.A. 178 n.2.) Over the Appellants' objections, the district court granted the motion to quash, stating that it was "fully satisfied that the documents sought by [the Appellants] are irrelevant to the claims that are now pending. Therefore, the [BCPD] should not

be put to the expense that would be required to assemble the documents requested by [the Appellants]." (J.A. 18.)

On appeal, the Appellants contend that the district court abused its discretion in granting the motion to quash because the ground relied upon - "relevance" to the underlying claims - is not a proper basis to quash a subpoena served on a non-party. They assert that the BCPD lacked "standing to tell [the Appellants] what documents [they] may use in support of their claims." (Opening Br. 39.) And they note that because discovery is permitted not only of information that could be admissible, but also of information that may lead to the discovery of admissible evidence, the district court abused its discretion in granting the motion. Lastly, they contend that the documents pertaining to the events of August [**19] 14 would have aided them in discovering the identities of other BCPD officers who were present at the scene. (Opening Br. 38-42.)

We are not persuaded that the district court abused its discretion in granting the motion to quash. *Federal Rule of Civil Procedure 26* governs discovery and provides as a general matter that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." *R. 26(b)(1)*. Relevance is thus the foundation for any request for production, regardless of the individual to whom a request is made. That the BCPD was no longer a party to the case did not make relevance of the materials requested an inappropriate factor for the court to consider. See *Misc. Dkt. Matter 1 v. Misc. Dkt. Matter 2, 197 F.3d 922, 925 (8th Cir. 1999)* (discussing factors to be considered in discovery against third parties, including relevance). Although *Rule 45(c)* sets forth additional grounds on which a subpoena against a third party may be quashed, taking into consideration facts peculiar to their status as a non-party, those factors are co-extensive with the general rules governing all discovery that are set forth in *Rule 26*.[7]

> 7    We further [**20] note that *Rule 45(c)(3)* requires courts to quash a subpoena that "subjects a person to undue burden" (*45(c)(3)(A)(iv)*). This ground encompasses situations where the subpoena seeks information irrelevant to the case or that would require a non-party to incur excessive expenditure of time or money, factors on which the district court's order expressly relied.

District courts are afforded broad discretion with respect to discovery generally, and motions to quash subpoenas specifically. The overwhelming majority of the materials the Appellants sought were directed at matters related to the dismissed claims against the BCPD. Documents and records [*813] containing the BCPD's training materials, performance reviews, internal investigation procedures, and all other allegations of misconduct for a ten-year period have no correlation to the claims against Officers Howard and Green. While the Appellants assert that these materials may have led to discovery of admissible evidence, they present no intelligible explanation of how that is so, nor can we detect any; the requests have every indicia of the quintessential fishing expedition.

The materials requested that related to Cook's death are more problematic [**21] given that they at least had some connection to the remaining claims in the case. However, it is not our task to substitute our judgment for that of the district court, but rather to assess "whether the [district] court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995)* (citation omitted). As we have previously stated:

> The purpose of standards of review is to focus reviewing courts upon their proper role when passing on the conduct of other decisionmakers. Standards of review are thus an elemental expression of judicial restraint, which, in their deferential varieties safeguard the superior vantage points of those entrusted with primary decisional responsibility. . . . At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.

*Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 320-21 (4th Cir. 2008)*.

Our review necessarily focuses on the information available to the district court at [**22] the time of its decision. The totality of those circumstances leads us to conclude that the court did not act arbitrarily or

484 Fed. Appx. 805, *813; 2012 U.S. App. LEXIS 18053, **22

capriciously in granting the motion to quash. As detailed above, the Appellants' request for production of documents sought an inordinate array of documents from a non-party in comparison to a limited number that may have been responsive and relevant to the remaining claims. In opposing the motion to quash, the Appellants did not request a modification of the request for production, but persisted at length in their assertion that all of the documents were necessary to their case. Furthermore, the BCPD's motion to quash conceded the discoverability of a small number of documents and voluntarily agreed to provide those documents to the Appellants.

As the dissent notes, a district court has the authority to quash or modify a subpoena duces tecum pursuant to *Federal R. Civil Procedure 45(c)(3)*. At no time in opposing the motion to quash, or even on appeal in this Court, have the Appellants suggested such an alternative. Nor did the BCPD recommend such a course. The district court decided the matter based on the positions taken and arguments advanced by each party. [**23] Such a course is neither arbitrary or capricious. That the district court could also have acted within its discretion by undertaking a different course of action -- i.e., sua sponte modification of the request rather than outright quashing -- does not make its selected course an abuse of discretion. See *Regan-Touhy v. Walgreen Co., 526 F.3d 641, 653 (10th Cir. 2008)* ("[W]e cannot see how the district court abused its considerable discretion in its resolution of the parties' discovery disputes given the nature of the requests at issue and the state of the record before the court at the time."). On this record, we cannot conclude that the district court acted arbitrarily or capriciously in granting the motion to quash.

[*814] 2. Motion to Substitute

On November 30, the Appellants moved to substitute Officers Fried and Choi as party defendants "John Does 1 and 2." Attached to the motion was a proposed second amended complaint, which contained the desired "substitutions." The proposed second amended complaint identifies Officers Fried and Choi as the BCPD officers who initially approached and pursued Cook; it alleges that Officer Green thereafter joined the foot pursuit, and that Officers Fried and [**24] Green took turns hitting the fence prior to Cook's fall. And it alleges that Officers Fried and Choi were "high-fiving and laughing" after Cook's death, and that Officer Bradley engaged in a

physical altercation with Officer Fried. In sum, the Appellants now alleged that Officer Green participated in some -- but not as much -- of the conduct allegedly preceding Cook's death, while Officer Howard was no longer alleged to have been present during any of those events. The only remaining claim against Officer Howard was that he participated in a post-death conspiracy to cover up the other BCPD officers' misconduct by filing a false report.[8]

> [8] Based on these changed factual allegations, the proposed second amended complaint adds Officers Fried and Choi to the Count II *§§ 1983* and *1985* causes of action based on deprivations of *Fourth* and *Fourteenth Amendment* rights. It also adds Officers Fried and Choi to and removes Officer Howard from the state law claims asserted in Counts IV and V.

The district court denied the motion to substitute. At the outset, the court noted that the motion was filed seven weeks after the October 12 deadline set in the scheduling order for amending the pleadings and [**25] joining parties, and under the language of the scheduling order, could only be granted upon a showing of good cause. The court rejected the Appellants' contention that they had demonstrated good cause based on its determination that the Appellants "ha[d] no one but themselves to blame for the untimeliness" in light of the length of time between the August 14, 2007 incident and the October 12, 2010 amendment deadline and long periods of inaction during which they could have learned the officers' identities before the deadline or preserved the opportunity to do so by requesting a later amendment deadline before that deadline expired. (J.A. 20.)

The Appellants assert the district court abused its discretion in denying the motion to substitute. They maintain both that *Federal Rule of Civil Procedure 15(a)* "evinces a bias in favor of granting leave to amend" that the district court ignored and that they have shown good cause for not meeting the amendment deadline. They also challenge the district court's factual determination that they could have discovered the identities and pertinent role of Officers Fried and Choi prior to the October 12 deadline for amending the complaint.

We have thoroughly [**26] reviewed the record with respect to the timing and implications of the relevant events, and conclude that the district court did not abuse its discretion in denying the motion to substitute. To the

484 Fed. Appx. 805, *814; 2012 U.S. App. LEXIS 18053, **26

extent the Appellants contend the district court held them to a higher bar for amendment than *Rule 15* provides, they fundamentally misunderstand the standard by which their motion was reviewed. *Rule 15(a)(2)* articulates a relatively liberal amendment policy, in which leave to amend should be "freely give[n] when justice so requires." That rule applies, however, prior to the entry of a scheduling order, at which point, under *Rule 16(b)(4)*, a party must first demonstrate "good cause" to modify the scheduling order deadlines, before also satisfying  **[*815]** the *Rule 15(a)(2)* standard for amendment. See *Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298-99 (4th Cir. 2008)*; see also *O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 155 (1st Cir. 2004)* (describing the interplay between these rules). Even apart from the federal rules, the scheduling order in this case specifically stated that "good cause" would be required to amend the pleadings at any point after the October 12 deadline. The district  **[**27]** court thus appropriately held the Appellants to the "good cause" standard.

We also conclude that the district court did not abuse its discretion in finding that the Appellants had not demonstrated "good cause" for the untimely motion to substitute. "Good cause" requires "the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence," and whatever other factors are also considered, "the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule." See 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure Civ. 3d § 1522.2 (3d ed. 2010) (collecting cases); see also 3 *Moore's Federal Practice § 15.14[1][b]*, at 16-72 (Matthew Bender 3d ed. 2010) ("[A]lthough undoubtedly there are differences of views among district judges about how compelling a showing must be to justify extending the deadlines set in scheduling orders, it seems clear that the factor on which courts are most likely to focus when making this determination is the relative diligence of the lawyer or lawyers who seek  **[**28]** the change."). Each of the Appellants' arguments as to why good cause exists rings hollow in light of the record before us. That record provides an ample basis from which the district court could conclude that the Appellants had not been diligent in pursuing the identities of additional BCPD officers they believed to be part of the alleged events surrounding Cook's death.

Contrary to the Appellants' assertion and the conclusion reached by the dissenting opinion, the district court's earlier grant of the motion to quash the request for production of documents did not directly bring about the Appellants' inability to timely acquire information about Officers Fried and Choi's alleged presence and participation in the events of August 14. This is so, in part, because the request for production intentionally listed a compliance date of October 15, three days past the October 12 amendment deadline. The record clearly shows the Appellants were aware of the proposed October 12 deadline when they set the October 15 return date. Yet during the scheduling order conference, the Appellants did not request a later amendment deadline in order to allow time to review any materials they received in  **[**29]** response to the request for production. Thus, even if the motion to quash had been denied in full or in part, the Appellants still would not have required the BCPD to produce the requested materials before the amendment deadline.[9]

9   The district court did not rely on the length of time between the amendment deadline and the filing of the motion to substitute (a seven-week gap) as a factor in determining whether the Appellants had demonstrated good cause. Instead, the district court relied on the significant amount of time between the August 14, 2007 incident and the filing of the motion, as well as the Appellants' failure to diligently pursue the matter between the February 2010 filing of the case and the filing of the motion to substitute. The district court's stated reasons for holding the Appellants responsible for the delay and finding they lacked diligence would not appear to have altered significantly had the district court received an untimely, but less untimely, motion to substitute and amend in the event the motion to quash had been denied. See also infra at pp. 33-35.

**[*816]** Moreover, at no time after the motion to quash had been granted did the Appellants make a timely motion to amend  **[**30]** the scheduling order deadline.[10] This is so despite the scheduling order's clear directive that deadlines would be strictly enforced and altered only if "good cause" had been shown. The Appellants have offered absolutely no explanation for why they did not file a timely motion to amend the scheduling order deadline once it became clear that sufficient discovery would not be completed in time to meet the October 12

484 Fed. Appx. 805, *816; 2012 U.S. App. LEXIS 18053, **30

deadline.[11]

10  Although the Appellants eventually moved to amend the scheduling order deadline, they did so after moving to substitute Officers Fried and Choi, and only once the issue was raised in Officers Howard and Greens' response to that motion. The district court eventually denied that motion for the same grounds it denied the motion to substitute.

11  When expressly asked about this point during oral argument, the Appellants' attorney noted only that he did not know at the time the scheduling order deadlines were set whether he would need more time. He offered no explanation for his failure to seek a timely modification in light of subsequent events and the approach of the amendment deadline.

Lastly, the record shows an overall lack of diligence on the Appellants' part, [**31] which the district court appropriately relied on in making its decision. As the district court noted, the Appellants did not file this case until approximately two-and-a-half years after the events in question. The initial and amended complaints expressly contemplated the addition of other BCPD officers as party defendants based on the inclusion of defendants "John Does 1-100," and the reference to other unnamed BCPD officers throughout the description of the events underlying the Appellants' claims. For the almost-seven-month period between filing suit and first seeking a request for production, the Appellants made no effort whatsoever to pursue limited discovery to identify any other BCPD officers who may have participated in any of the alleged events.[12]

12  Contrary to the Appellants' protestations that they could not undertake discovery until after the scheduling order was filed, the local rules permit discovery at an earlier time as "ordered by the court or agreed upon by the parties." *Local Rule 104.4.*

The failure to pursue limited discovery for this purpose was not attributable to the Appellants not knowing the identity of individuals who had relevant information. The record shows [**32] that at the time they filed suit, the Appellants knew the identities of at least five individuals who had information relevant to the events of August 14: BCPD Officers Howard, Green, and Bradley; BCPD supervisory officer Colonel Bevilaqua;

and eyewitness Shamika Summers.[13] These facts underscore the Appellants' lack of diligence throughout [*817] the proceedings in identifying "known unknown" individuals who might be part of their case. As the Eleventh Circuit has stated:

The lack of diligence that precludes a finding of good cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes. That lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order.

See *S. Grouts & Mortars v. 3M Co., 575 F.3d 1235, 1241 n.3 (11th Cir. 2009).*

13  The Appellants had obtained a copy of Officer Howard's accident report as early as October 2007. That report identifies Colonel Bevilaqua as the highest ranking officer present at the scene of the investigation into Cook's death. It identifies Officer Green as the police officer who initiated the foot pursuit with [**33] Cook and provides Officer Green's telephone number and address. It also identifies Officer Howard as the "reporting" officer and includes his address and telephone number.

Although it is not clear from the record when the Appellants first learned of eyewitness Shamika Summers' knowledge of the incident, the Appellants' private investigator took her statement in November 2009, also well before filing suit. Her statement includes a description of the BCPD Officer she alleged shook the fence. Although she did not identify him by name at that time, in her deposition taken after the expiration of the amendment deadline, she identified Officer Fried as that officer. This information unequivocally shows the Appellants had notice of individuals who would have further details of the incident.

Despite the Appellants knowing there were as-yet-unidentified individuals involved in the events they alleged occurred on August 14, and despite their expressed desire to include these "John Doe" police officers as party defendants in their case, the Appellants

did not pursue any discovery that would have allowed them to file a timely amendment of the complaint. The Appellants, and to some degree the dissent, [**34] counter that until November 2010 they were not aware that named party defendants Officer Howard and Green were not the officers involved in the foot pursuit and that Officers Fried and Choi were present at that time. This argument goes to the significance of the amendments they sought to make. It does not, however, bear on the lack of diligence in the first instance.

It is true that Officer Howard's accident report appears to have mistakenly named Officer Green as the officer involved in the initial foot pursuit. However, nothing in Officer Howard's report suggests that the Appellants were correct in asserting that Officer Howard had been present for or a participant in any of the events leading up to Cook's death. Moreover, as discussed, the amended complaint charged additional unknown BCPD officers with participating in various other key parts of the claimed unlawful activity. The Appellants thus clearly believed other individuals were involved as well and had information that put them on notice that they may need to amend their complaint in light of facts revealed during discovery. But they did not pursue any of these "known unknowns" in the case in a manner that would have permitted [**35] them to make a timely amendment. On this record, they cannot now succeed in complaining that their lack of diligence should be excused because they did not realize the unidentified individuals in their action would not just be added to their existing claims but would also alter the nature of (if not eliminate) their claims with respect to Officers Howard and Green.

The record also demonstrates that the Appellants' failure to pursue limited - or earlier - discovery mattered for purposes of identifying Officers Fried and Choi because had that been pursued, the Appellants almost certainly could have ascertained their presence and role significantly earlier than they did. For example, eyewitness Shamika Summers and Officer Bradley both identified Officer Fried in their depositions. Indeed, Officer Bradley indicated in his deposition testimony that he had met Cook's Fiancée, Appellant Hammond, prior to the events of August 14, and that he visited her shortly after Cook's death to describe the events of that day to her, including the alleged participation of Officer Fried.[14] In addition, [*818] Officers Howard and Green both identified Officers Fried and Choi as being present on August 14 in their [**36] responses to interrogatories.

And, as discussed elsewhere in this opinion, Officer Howard denied being present at the scene until after Cook's death; had the Appellants questioned Officer Howard for the purpose of ascertaining his knowledge of other individuals' roles in the events leading up to Cook's death, they would have necessarily discovered why he could not answer those questions and could have timely pursued additional information to determine the identity of the officers who were actually involved in the pursuit as well.

14    The uncontested evidence shows that Hammond knew Officer Bradley had additional information about who may have been present and involved in the August 14 incident. As such, the Appellants could have deposed him earlier in an effort to identify additional participants to the events. Had they done so, Officer Bradley could have led them to Officer Fried and, in turn, to Officer Choi. Yet the Appellants elected not to depose Officer Bradley until November 30, well after the October 12 deadline for amending the pleadings, despite being privy to this opportunity at least three years earlier.

The Appellants' failure to seek information from any one of these witnesses [**37] at an earlier date meant that they could not pursue any leads those witnesses provided in time to make a timely amendment. In view of these readily apparent avenues available to the Appellants and yet left entirely unexplored, they have merely evinced an earlier desire to know something and have not demonstrated they acted--with diligence or otherwise--in timely pursuing that knowledge. See *Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1299 (11th Cir. 2007)* (holding that good cause did not exist where movant was on notice of information that, "with some investigation," would have led to timely discovery of the basis for the motion to amend); *Trustmark Ins. Co. v. General & Cologne Life Re of America, 424 F.3d 542, 553 (7th Cir. 2005)* (same).[15]

15    We reject the Appellants' assertion that the BCPD intentionally concealed the identities of Officers Fried and Choi until after the amendment deadline. There is simply no evidence in the record to support that allegation; it is only rank speculation on the part of the Appellants.

The partial dissent focuses on a perceived "domino effect" that the grant of the motion to quash had on the

timing of the motion to substitute and the [**38] district court's analysis of the latter motion. It speculates that the Appellants may have received salient information from the BCPD prior to the amendment deadline, or at the very least any motion to substitute could have been less untimely. It is pure conjecture to suggest that the Appellants may have acquired any information sought in the request for production prior to October 15, particularly in light of language of the request itself. But even assuming, arguendo, that the district court abused its discretion with respect to the motion to quash, that assumption would only mean that the BCPD would have been required to produce the requested documents--including Officers Fried and Choi's police reports--by October 15, the delinquent deadline the Appellants knowingly set. Any motion to amend based on those documents would still have been subject to the higher "good cause" standard set forth above, based on both *Fed. R. Civ. P. 16(a)* and the plain terms of the scheduling order. "Good cause" would still require the Appellants to demonstrate, at bottom, that they had exercised diligence in obtaining the information but that they were nonetheless unable to comply with the scheduling order [**39] deadline.

Nothing in the district court's "good cause" analysis would have changed given that the court identified four specific reasons for concluding that the Appellants had demonstrated an overarching and persistent lack of diligence throughout the case. While the dissent theorizes on the district court's "general frustration . . . with various other delays" in the case, post at 60 n.22, the district court's reasoning is precisely the appropriate analysis to determine the existence of "good cause." That is, in considering whether "good cause" [*819] excuses compliance with a scheduling order deadline, the district court must examine whether the movant had been diligent, though unsuccessful, in attempting to acquire the information that would have formed the basis of a timely motion to amend. To be sure, the movant's conduct in the period between the deadline and the untimely motion is also relevant to showing continued diligence in acquiring the information. But the court's focus is appropriately and necessarily on the movant's overall conduct of the case, and in particular what action led to missing the scheduling order's deadline. See, e.g., *Fahim v. Marriott Hotel Services, Inc., 551 F.3d 344, 348 (5th Cir. 2008)* [**40] ("'Good cause' . . . requires a party to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.") (internal

quotation marks omitted); *Leary v. Daeschner, 349 F.3d 888, 907 (6th Cir. 2003)* (holding that to show "good cause" a movant must demonstrate "that despite their diligence they could not meet the original deadline"); *Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)* (per curiam) (holding that good cause did not exist where counsel waited months after filing of the pleadings to propound written discovery and did not take oral depositions of known key individuals to their claims until after the deadline for amending the complaint).

As noted, the Appellants alleged from the outset of the case that as-yet-unknown BCPD officers were present during and participated in the events they asserted to have caused Cook's death. As of late 2007, the Appellants knew the identities of several witnesses who could have provided information about the events of August 14 that could have led them to learn the identities and alleged roles of Officers Fried and Choi. Yet they completely failed to pursue any limited or otherwise timely [**41] discovery to obtain information about the "known unknown" individuals they believed could be potential defendants in their case. They also knowingly selected a return date on the request for production that was after the amendment deadline. The Appellants never asked for that deadline to be altered prior to its passing and offer no explanation for their failure to do so. None of these factors have anything to do with the district court's earlier grant of the motion to quash, which, had it been denied in full or part, at most would have allowed the Appellants to file a less untimely motion to substitute. Every other factor--and significantly, every factor the district court relied on, and every factor relevant to showing diligence in meeting the October 12 deadline--would be unaltered. For this reason, we conclude that the district court's decision with respect to the motion to quash did not have a harmful "domino effect" on the events surrounding the Appellants' motion to substitute.

In addition to all of the reasons set forth above supporting the district court's decision, we are also ever mindful that our standard of review gives the district court great deference, even if it is not [**42] always an insurmountable hurdle. Having conducted that review, we conclude the district court did not abuse its discretion in determining that the Appellants' repeated lack of diligence precluded a finding of good cause to excuse the untimely motion to substitute. Our review of the totality of the events surrounding both the grant of the motion to quash and the denial of the motion to substitute leads us

484 Fed. Appx. 805, *819; 2012 U.S. App. LEXIS 18053, **42

to hold that the district court did not abuse its discretion in ruling on either motion.

C. Claims Against Officers Howard and Green

When the dust settled from the earlier motions and orders in this case, Officers Howard and Green moved for summary judgment as to all claims remaining [*820] against them, which the district court granted. The Appellants contend the award of summary judgment was improper because there remained genuine issues of material fact, which if resolved in their favor, presented sufficient "evidence from which a jury could find that police officers Howard and Green committed act[s] that caused the deprivation of" Cook's and the Appellants' rights under the *Fourth* and *Fourteenth Amendments*. (Opening Br. 51.) We disagree.

Under *Federal Rule of Civil Procedure 56(a)*, a district [**43] "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In undertaking our de novo review of the district court's grant, we view the facts in the light most favorable to the Appellants, and draw all reasonable inferences in their favor. *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677 (2009)* (quotation marks and citation omitted).

1. Claims Regarding Events Leading Up To Cook's Death

The Appellants contend there is an unresolved question of fact as to Officer Green's location during the events of August 14. Officer Green testified during his deposition that he arrived only at the "highway level" after Cook's death, and there is additional evidence in the record to support this testimony. However, during her deposition, eyewitness Shamika Summers identified Officer Green as the African-American officer she saw pursuing Cook on foot and then present at the fence above the highway [**44] after Cook climbed over it and before he fell. Some additional evidence tends to support this testimony, including Officer Howard's accident report, which lists Officer Green as the BCPD officer who approached and pursued Cook, and was present at the fence when Cook fell. (Opening Br. 52-53.)

We have reviewed the evidence the Appellants point to and agree with the district court that although there remains a question of fact as to Officer Green's location, that question is not material. "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)* (citation omitted); *Hawkspeare Shipping Co. v. Intamex, S.A., 330 F.3d 225, 232 (4th Cir. 2003)* ("There is a material dispute of fact when the fact's existence or non-existence could lead a jury to different outcomes."). Under this standard, the Appellants must present evidence that Officer Green engaged in conduct that violated Cook's *Fourth* and *Fourteenth Amendment* rights, wherever he was located. As explained presently, [**45] however, even if we assume he participated in the foot pursuit and was present at the fence prior to Cook's death, the Appellants have failed to create a genuine issue of material fact with respect to what Officer Green did.

The only evidence in the record that the Appellants offer to establish Officer Green's conduct is Summers' deposition testimony and Officer Howard's accident report. The report simply states that after Cook leapt over the fence, he "lost his hand-hold before Officer Green could get to him, and Cook fell the 70 feet to the concrete roadway below." (J.A. 972.) Summers, meanwhile, stated that she observed Caucasian police officers shaking the fence, and that the one African-American BCPD officer present at the scene was [*821] not shaking the fence, but was trying to coax Cook to safety before he fell. Like the accident report, Summers' deposition statement does not create a genuine issue of material fact as to Officer Green's conduct. Even if the Appellants were able to establish that Officer Green was present at the fence and was the African-American BCPD officer Summers saw there, the Appellants have not created a genuine issue of material fact with regard to what he did [**46] there. Accordingly, the district court did not err in deciding that the Appellants failed to raise any genuine issue of material fact with regard to their claims against Officer Green as a result of the question about his location during the events in question.

Next, the Appellants contend that the district court should not have granted summary judgment with respect to their claim based on alleged violations of Cook's *Fourth Amendment* rights-- that Cook was unreasonably

seized on August 14. Specifically, they point to: (1) the *Fourth Amendment's* protection "against arrests without probable cause, [and] against the use of excessive force in making arrests and detentions that are themselves supported by probable cause" (Opening Br. 57); and (2) cases in which courts have held that a police officer's failure to intervene during another officer's use of excessive force can be the basis of *§ 1983* liability. From these concepts, they assert there is sufficient evidence in the record from which a jury could conclude that Officer Green was liable for violating Cook's *Fourth Amendment* rights because Officer Green allegedly witnessed Officer Fried violating Cook's *Fourth Amendment* rights by seizing [**47] him without probable cause and using excessive force during that seizure, and yet failed to stop either violation. As a result, they maintain that summary judgment on their *Fourth Amendment* claim was improper.[16]

> 16    The Appellants initially alleged a *Fourth Amendment* claim against Officer Howard as well. It appears they abandoned that claim in light of their acceptance of undisputed evidence produced during discovery that showed Officer Howard was not present until arriving at the highway level after Cook's death. Although parts of the opening brief continue to allege that Officer Howard was present at the fence, it appears that allegation is limited to a recitation of the facts for purposes of the *Rule 12(b)(6)* motion. There is a difference, however, between viewing the facts alleged in the amended complaint as true for purposes of our review of the *Rule 12(b)(6)* motion and improperly representing facts to the Court that counsel now knows to be false. Counsel is cautioned not to engage in such conduct in any future submissions to this Court. In any event, the Appellants have abandoned a *Fourth Amendment*-based claim against Officer Howard, and even if they had not, such a claim would [**48] fail based on the record before us.

The district court concluded that the *Fourth Amendment* was not implicated in this case because the facts, viewed in the light most favorable to the Appellants, showed that Cook had never been "seized" within the meaning of the *Fourth Amendment*: "Although the police were certainly attempting to effectuate a seizure of Mr. Cook, their attempt failed, as he got behind the fence without any physical police contact . . . ." (J.A.

29.) We agree with the district court's analysis and application of Supreme Court precedent.

As relevant here, the *Fourth Amendment* protects against "unreasonable . . . seizures." This *Fourth Amendment* protection is not implicated every time a police officer approaches an individual to ask a few questions.[17] *Florida v. Bostick, 501 U.S. 429, 434, [*822] 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)*; *Schultz v. Braga, 455 F.3d 470, 480 (4th Cir. 2006)*. Rather, there must be a "seizure," that is, a situation where, "in view of the totality of the circumstances . . ., a reasonable person would not feel free to leave or otherwise terminate the encounter." *United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)*. A seizure requires "either physical force . . . or, where that is [**49] absent, submission to the assertion of authority." *California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)* (emphasis omitted).

> 17    The Appellants repeatedly refer to the BCPD officers' initial approach and pursuit of Cook as being unlawful due to a lack of probable cause. They are wrong as to both the law and the facts. During discovery, several points came to light which are no longer disputed by any evidence (despite the Appellants' bald assertions to the contrary), and which are relevant to understanding the initial encounter between Cook and the BCPD officers. The officers observed Cook walking in such a manner that suggested he was carrying a concealed weapon at his waist. When they approached him in order to conduct a field interview, Cook fled and the officers pursued him. A firearm was later retrieved from Cook's body.
>
> While we undertake the basic *Fourth Amendment* "seizure" analysis employed by the district court, we also note that under the Supreme Court's precedent regarding Terry stops and in particular its decision in *Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)*, the BCPD officers were not required to have probable cause simply to approach Cook initially so long as they had a "reasonable, [**50] articulable suspicion" of criminal activity. Moreover, even absent a reasonable, articulable suspicion, once Cook engaged in "unprovoked flight upon noticing the police," the police could lawfully pursue him in order "to briefly

484 Fed. Appx. 805, *822; 2012 U.S. App. LEXIS 18053, **50

investigate further." see *id. at 123-26*.

The facts of this case, viewed in the light most favorable to the Appellants, could not establish that a "seizure" by either physical force or submission to an assertion of authority occurred. A seizure by physical force occurs when there is "a governmental termination of movement through means intentionally applied." *Brower v. Cnty. of Inyo, 489 U.S. 593, 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)* (emphasis omitted) (analyzing whether a seizure by physical force occurred when a fleeing subject ran into and was killed on impact with a police-created roadblock set in place to stop the subject); *Hodari D., 499 U.S. at 624* ("From the time of the founding to the present, the word 'seizure' has meant a taking possession. For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but actually bringing it within physical control.") (internal citations omitted); *id. at 629* [**51] (holding no "seizure" occurred until Hodari was physically apprehended, i.e., tackled to the ground to stop his flight); see also *Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843-44, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)*. Cook fled from BCPD officers as they approached him; there is no evidence in the record that they ever made physical contact with Cook, nor is there evidence that they terminated his "freedom of movement through means intentionally applied." Contrast *Brower, 489 U.S. at 597-98* (holding that where the police roadblock was intended to stop Brower by physical impact and did so, a seizure occurred).

When an officer acts by a show of authority rather than physical restraint, "the individual must actually submit to that authority" for there to be a "seizure." *United States v. Beauchamp, 659 F.3d 560, 566 (6th Cir. 2011)* (citing *Brendlin v. California, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)*). Even assuming that the BCPD officers' approach and pursuit of Cook constituted "show of authority," Cook's flight nonetheless demonstrates a lack of submission such that a "seizure" did not occur. See *Hodari D., 499 U.S. at 629* (assuming that a police officer's pursuit constitutes a "show of authority," a defendant's non-compliance [**52] [*823] meant there was no seizure during the course of the pursuit); see also *United States v. Griffin, 652 F.3d 793, 800-01 (7th Cir. 2011)* ("[A] seizure by show of authority does not occur unless and until the suspect submits.") (emphasis in original). At no time did

Cook submit to a show of authority.

The uncontroverted record evidence thus supports the district court's determination that Cook had not been "seized" within the meaning of the *Fourth Amendment*. Accordingly, the court did not err in granting Officer Green summary judgment on the *Fourth Amendment* claim.

The Appellants next advance the argument that the district court erred in granting summary judgment to Officer Green on their claim that his conduct violated Cook's substantive due process rights. A *§ 1983* claim of this sort (based on executive branch action) is more difficult to prove than alleging substantive due process violations resulting from legislative action. "[T]he Supreme Court has . . . marked out executive conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less." *Waybright v. Frederick County, Maryland, 528 F.3d 199, 205 (4th Cir. 2008)* (quoting *Lewis, 523 U.S. at 850*). [**53] Negligence is, by definition, insufficient to satisfy this hurdle, although something less than intentional conduct may, in special circumstances, be sufficient.[18] Id. The Supreme Court has thus instructed:

> [I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action . . . .

*Lewis, 523 U.S. at 847 n.8.*

18   We note that the Appellants rely on *Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981)*, to contend that negligence is sufficient to establish liability under *§ 1983*. In so doing, they overlook the Supreme Court's

484 Fed. Appx. 805, *823; 2012 U.S. App. LEXIS 18053, **53

decision in *Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*, which overruled Parratt in relevant part, by holding that *Fourteenth Amendment* [**54] due process violations "must flow from conduct amounting to more than mere negligence." *Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 719 (4th Cir. 1991)*.

Counsel's reliance on subsequently overruled case law is not isolated to this one instance. Quite apart from the lack of merit of the Appellants' claims, we once again caution counsel that such advocacy renders a disservice to his clients and should not be repeated.

We conclude that the Appellants' allegations with regard to Officer Green -- the only BCPD officer who is a party defendant and who is alleged to have been at the scene prior to Cook's death -- do not rise to the requisite level to survive summary judgment. Simply put, even assuming that Officer Green pursued Cook on foot and was present at the fence, there is nothing about his alleged conduct in the record evidence that "shocks the conscience." As noted above, two sources place Officer Green as a participant in the foot chase and present at the fence prior to Cook's fall--Officer Howard's accident report (albeit hearsay) and eyewitness Summers' deposition testimony. The accident report does not contain any evidence to support a substantive due process claim against Officer [**55] Green, as that report simply [*824] indicates that Cook "lost his hand-hold before Officer Green could get to him [behind the fence]." (J.A. 972.)

Summers' deposition testimony also precludes the conclusion that Officer Green violated Cook's due process rights. Summers stated that she observed one African-American BCPD officer at the scene; she identified that officer as Officer Green. She averred that Officer Green never shook the fence, but was "trying to talk [Cook] into coming around . . . and get down," and to coax him to a safe position. (J.A. 581, 586-88, 614, 617-19, 639, 679.) She further stated that after Cook fell, the African-American officer "looked dazed and stunned," and was "crying." (J.A. 585, 590, 654-55.) When asked whether Summers saw the African-American officer "do anything to cause injury to [Cook,]" or to "cause [Cook] to fall," Summers replied, "No, sir," "I didn't hear him call him names and I didn't

see him pushing the fence." (J.A. 655, 656.)

Even in the light most favorable to the Appellants (i.e., accepting that Officer Green was the African-American BCPD officer Summers observed near the fence), Summers' testimony clearly states that officer did not participate [**56] in any actionable conduct. Nor does her statement allow an inference that Officer Green simply stood by and allowed the other officers to violate Cook's due process rights: according to Summers' testimony, the African-American officer was attempting to talk Cook down from the fence and bring him to safety. Speculation that Officer Green could have done something else or more is not the standard by which a claim against him is judged, and the record does not demonstrate that Officer Green's conduct rose to the level of culpability required for a viable due process claim. See *Patten v. Nichols, 274 F.3d 829, 834 (4th Cir. 2001)* ("While it is clear that intentionally harmful conduct may constitute a violation of the *Fourteenth Amendment*, it is equally clear that negligence alone does not amount to a constitutional violation."); *Lewis, 523 U.S. at 853* ("[W]hen unforeseen circumstances demand [a police] officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed.") (internal quotation marks omitted); *id. at 840-55* (describing the different degrees of culpability [**57] required).

In contrast with the actual evidence in the record, the Appellants' opening brief consists of rank conjecture and speculation by alleging that Officer Green actively participated in the Caucasian BCPD officers' allegedly violative conduct. But at the summary judgment stage, the Appellants can no longer rest on mere allegations; instead, they must have set forth specific evidence to support their claims. See *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. The facts they have established, even when viewed in the light most favorable to them, do not set forth a viable substantive due process claim against Officer Green. His conduct cannot, as a matter of law, be said to "shock the conscience," or to be so egregious or outrageous so as to state a claim for a constitutional violation. For these reasons, we hold that the district court did not err in awarding summary judgment to Officer Green.

2. Claims Based on a Conspiracy to Cover-Up Cook's

484 Fed. Appx. 805, *824; 2012 U.S. App. LEXIS 18053, **57

Death

The Appellants also contend that the district court erred in granting summary judgment to Officer Howard on their substantive due process claims. As already recognized, the Appellants' claims against Officer Howard shifted significantly [**58] in [*825] light of the evidence produced at discovery. By the time the summary judgment motion was decided, the only claims remaining against Officer Howard were based on his alleged participation in a conspiracy to cover up the true circumstances of Cook's death by, inter alia, filing a false accident report. The district court granted summary judgment to Officer Howard based on its conclusion that the Appellants had not identified a protected interest.

The Appellants assert that the record contains sufficient evidence from which a jury could conclude that Officer Howard participated in a conspiracy that violated the Appellants' due process rights. The Appellants suggest Officer Howard's conduct implicates two protected due process interests. First, they contend that "a parent or child of a decedent whose death was [caused] by the unlawful conduct of police officers have a" substantive due process claim against those officers and any individual who covers up that misconduct. (Opening Br. 61-62.) Second, they contend that the conspiracy to cover up the events surrounding Cook's death impeded their access to courts.

We agree with the district court: Officer Howard was entitled to judgment as [**59] a matter of law because the Appellants failed to identify and adequately plead protected constitutional interests. As we recognized in *Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994)*, "the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the *Fourteenth Amendment due process clause* to encompass deprivations resulting from governmental actions affecting the family only incidentally." *Id. at 805.* We declined to sanction such a claim in Shaw, and we adhere to that precedent. See id.

Similarly, the Appellants failed to advance a viable claim based on a conspiracy to deny access to courts. Such a claim required proof that Officer Howard and others "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] Appellants' deprivation of a constitutional right (in this case the right to access to courts)." *Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).* The

evidence does not disclose any communication-- direct or circumstantial--that Officer Howard intentionally filed a false accident report or otherwise attempted to cover up the events of August 14, let alone that he conspired with [**60] anyone to do so. "The problem with [the Appellants'] evidence is not merely that each act alleged is capable of an innocent interpretation. Rather, the problem is that [the] evidence amounts to nothing more than rank speculation and conjecture." *Id. at 422* (rejecting access to courts conspiracy claim).

At bottom, the Appellants' argument appears to be that because Officer Howard's report contradicts their speculation about what happened and thus impedes their ability to prove it in court, he had to have participated in a conspiracy that denied their right to access to courts. This argument necessarily fails not only for the problems already identified, but also for the reason identified by the district court: the Appellants have failed to identify with any specificity how Officer Howard's purported conduct prevented them from seeking judicial redress. See *Christopher v. Harbury, 536 U.S. 403, 414-16, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002)*; see also *Swekel v. City of River Rouge, 119 F.3d 1259, 1263-64 (6th Cir. 1997)* (access to courts claims require proof "that the defendants' actions foreclosed [the Appellants] from filing suit in . . . court or rendered ineffective any . . . remedy [they] previously may have had"). [**61] Having failed to produce evidence of Officer Howard's participation in a conspiracy to cover up the events surrounding Cook's death or to plead with sufficient particularity how such [*826] a conspiracy would have implicated their right to access courts, this substantive due process claim also fails.[19][20]

19 In their opening brief, the Appellants make a passing reference to Officer Green's purported participation "in the cover-up of the unlawful actions of all the police officers," such that he, too, is liable for participating in a conspiracy to violate Cook's constitutional rights. (Opening Br. 59.). The district court found that the Appellants had not pled a conspiracy claim against Officer Green in their amended complaint, but had raised such a claim for the first time in their opposition to summary judgment. For that reason, it held the Appellants had not satisfied "the basic notice pleading standards" required in *Federal Rule of Civil Procedure 8(a)*.

484 Fed. Appx. 805, *826; 2012 U.S. App. LEXIS 18053, **61

We agree with the district court. Federal pleading requires that a complaint give defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* Even under Rule 8's [**62] liberal pleading requirements, no reading of the amended complaint could conclude that it contains a cognizable conspiracy claim against Officer Green. Accordingly, the district court correctly held that this claim was barred. See *Slade v. Hampton Roads Regional Jail, 407 F.3d 243, 254 (4th Cir. 2005)* ("[N]otice pleading requires generosity in interpreting a plaintiff's complaint. But generosity is not fantasy.") (internal quotation marks and citation omitted).

20    The Appellants also challenge the district court's grant of summary judgment with respect to Counts IV and V, their state law claims. We have reviewed the parties' arguments and find no reversible error in the district court's determination that those claims were precluded due to the Appellants' failure to provide the requisite notice under Maryland's Local Government Tort Claims Act.

For the aforementioned reasons, the district court did not err in granting summary judgment to Officers Howard and Green as to all of the claims the Appellants asserted against them.

III.

For the foregoing reasons, we affirm the judgments of the district court.

AFFIRMED

**CONCUR BY:** DIAZ (In Part)

**DISSENT BY:** DIAZ (In Part)

**DISSENT**

DIAZ, Circuit Judge, dissenting in part and concurring [**63] in part:

While the majority opinion highlights the many missteps in this case, it ultimately assigns sole responsibility for them to the Appellants, affirming the judgment of the district court across the board. I disagree,

and would hold instead that the district court abused its discretion in granting the BCPD's motion to quash based on its blanket conclusion that the documents sought by the Appellants were irrelevant. And, looking to the domino effect of that decision on the Appellants' subsequently denied motion to substitute, I do not believe that the court's error was harmless. Accordingly, although I concur in the remainder of the opinion, I am unable to join Part II.B.

I.

In considering the district court's decision to quash the Appellants' request for documents related to Cook's death, the majority properly emphasizes the deference that we owe the district court on appeal. Review for abuse of discretion, however, does not mean a district court's authority is carte blanche. See *United States v. Under Seal (In re Grand Jury), 478 F.3d 581, 584 (4th Cir. 2007)* ("A district court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly [**64] erroneous factual finding." (quoting *Morris v. Wachovia Sec., Inc., 448 F.3d 268, 277 (4th Cir. 2006)));* see also *United States v. Mason, 52 F.3d 1286, 1289, 1293 (4th Cir. 1995)* (noting the deferential standard of review, but finding an abuse of discretion). Mindful that I may not substitute my judgment for that of the district court, I believe [*827] nonetheless that in quashing the Appellants' document request in its entirety on relevance grounds, the court abused its discretion, and that this error in turn infected the court's analysis of "good cause" as to the Appellants' later-filed motion to substitute.

As support for its decision to grant the BCPD's motion to quash, the district court stated simply that it was "fully satisfied that the documents sought by [the Appellants] are irrelevant to the claims that are now pending." J.A. 18.[1] I do not dispute that most of the documents sought by the Appellants were irrelevant. Yet the relevance of documents responsive to the first three requests—including incident reports, witness interviews, surveillance records, and statements from police officers related to the tragic events of August 14, 2007 and involving Cook—is equally clear. Moreover, [**65] in opposing the BCPD's motion to quash, the Appellants specifically argued that some of the documents would lead to evidence regarding their claims against Officers Howard and Green "and would also lead to the disclosure of the identity of the other police officers at the scene."

484 Fed. Appx. 805, *827; 2012 U.S. App. LEXIS 18053, **65

Id. 192 (emphasis added). Significantly, had the district court ordered the BCPD to produce those documents that were relevant to the remaining claims, the Appellants would have known on or before October 15, 2010 that Officers Fried and Choi were also involved in Cook's pursuit.

> 1   The majority also highlights the district court's assertion that the BCPD should not be put to the expense of assembling the requested documents. The expense consideration, however, trailed the court's relevance finding. That is, immediately after determining that the requested documents were "irrelevant," the court opined that "[t]herefore, the [BCPD] should not be put to the expense" of assembling them. J.A. 18.

Thus, it is little wonder, as the majority acknowledges, that the district court's wholesale quashing of the requests "related to Cook's death" is "more problematic." Maj. Op. at 19. I agree, particularly given that the operative **[\*\*66]** procedural rule grants a district court the power to quash **or** modify a subpoena. See *Fed. R. Civ. P. 45(c)(3)* (emphasis added). In my view, a district court abuses its discretion when--as in this case--it fails to recognize or consider the range of options available to it before ruling on a motion to quash. For example, in *Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 818-19 (5th Cir. 2004)*, the Fifth Circuit held that the district court abused its discretion in quashing a subpoena "outright," noting in part that the court did not "attempt to modify the subpoena to cure any overbreadth" and adding that "[g]enerally, modification of a subpoena is preferable to quashing it outright." See also *Linder v. Nat'l Sec. Agency, 94 F.3d 693, 698, 320 U.S. App. D.C. 359 (D.C. Cir. 1996)* (agreeing that "a modification of a subpoena is generally preferred to outright quashing," but finding no abuse of discretion where the subpoena request could not be modified "in any fruitful manner"). Here, the district court's decision to quash in toto the Appellants' request for production of documents swept far too broadly.

While reluctant to concede the district court's error, the majority nevertheless attempts to excuse it by noting **[\*\*67]** that the BCPD acknowledged in the motion to quash its obligation to produce "non-privileged, non-disciplinary/personnel related responsive documents in its possession . . . that pertain specifically to the facts and circumstances of the August 14, 2007 incident." J.A.

178 n.2. That concession, however, is far from satisfying when put in context, particularly since the district court placed no conditions or limitations on its order to quash, and thus the BCPD was free to produce documents--or not--at its leisure. As it happened, the BCPD did not produce the documents until November **[\*828]** 22, 2010, well after both the October 15, 2010 return date set forth in the Appellants' request for production of documents and the October 12, 2010 deadline for amending pleadings.

II.

It is against this backdrop that I consider the district court's related denial of the Appellants' motion to amend their pleadings (by substituting Officers Fried and Choi as party defendants) as lacking "good cause." The majority insists that the district court's earlier ruling on the motion to quash "did not directly bring about the Appellants' inability to timely acquire information about Officers Fried and Choi's alleged presence **[\*\*68]** and participation in the events of August 14," Maj. Op. at 25, opting instead to place sole responsibility for that result on the Appellants' lack of diligence. The Appellants certainly deserve substantial blame for the procedural mess that is this case. But unlike the majority, I am unwilling to ignore the domino effect of the district court's error on the motion to quash when considering whether the Appellants subsequently demonstrated good cause to amend their pleadings.

In analyzing this issue, I am of course bound by the "harmless error" doctrine, which commands that "[u]nless justice requires otherwise, no error . . . by the court . . . is ground for . . . vacating, modifying, or otherwise disturbing a judgment or order" and that we must "disregard all errors and defects that do not affect any party's substantial rights." *Fed. R. Civ. P. 61.* See *Tagupa v. Board of Directors, 633 F.2d 1309, 1312 (9th Cir. 1980)* (citing *Rule 61* and noting that "[t]he harmless error doctrine applies to discovery orders"); see also *Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994)* (declining to excuse the district court's exclusion of evidence as harmless where a party "was prevented from fully developing **[\*\*69]** evidence relevant to a material issue"). I conclude here, however, that the district court's error on the motion to quash ruling was not harmless.

In arriving at that conclusion, I necessarily concede that the Appellants (1) inexplicably set a return date for the request for production of documents that was three

484 Fed. Appx. 805, *828; 2012 U.S. App. LEXIS 18053, **69

days beyond the scheduling order's deadline for joining parties and amending pleadings, (2) did not request an extension of the scheduling order deadlines after the district court granted the motion to quash, and (3) failed to ask the district court for permission to conduct discovery prior to the entry of the scheduling order. Yet these mistakes were not inexorably fatal, as "good cause" does not demand perfection by a litigant. See 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1522.2 (3d ed. 2010) ("The use of the good-cause standard [for modifying scheduling orders], rather than allowing modification only in cases of manifest injustice as is done for other pretrial orders, indicates that there may be more flexibility in allowing some relief.") (citation omitted).

As it relates to the "good cause" determination, it was not until [**70] November 22, 2010 that the BCPD first disclosed that Officers Fried and Choi were involved in the pursuit of Cook. A mere eight days later, the Appellants filed the motion to substitute, arguing that they "could not have reasonably moved to amend the complaint to substitute the names of these John Doe defendants any earlier" than November 22, 2010. J.A. 202.

Even recognizing the Appellants' many procedural blunders, had the district court parsed the request for documents when considering the motion to quash, and ordered the production of those documents that were patently relevant, the Appellants would have obtained the reports of Officers Fried and Choi by October 15, 2010 at the latest--rather than five weeks later. [*829] Admittedly, the Appellants may nevertheless have been left to file an untimely motion to substitute, but a trial judge considering whether there is "good cause" to allow such a motion surely must account for the length of the delay. See O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 155 (1st Cir. 2004) (affirming denial of motion to amend filed five months after the scheduling order deadline and concluding that "[s]uch a long and unexplained delay vindicates the [**71] district court's conclusion that plaintiffs were not diligently pursuing this litigation").[2]

  2 Curiously, the district court's order denying the motion to substitute makes little mention of the seven-week delay between the filing of the motion and the deadline in the scheduling order for seeking such relief. A general frustration,

however, with various other delays in the litigation clearly drove the court's conclusion that the Appellants failed to demonstrate good cause. Specifically, the court noted that the (1) Appellants' motion to substitute came nearly three years after Cook's death, (2) suit was filed in February 2010 and although the scheduling order was not entered until September 9, 2010, this was due to the Appellants' naming of several improper defendants, and (3) Appellants did not move for leave to conduct pre-scheduling order discovery. Any frustration on the part of the district court with the slow progress of the litigation--a sluggishness that the court attributed solely to the Appellants--was certainly not helped by the filing of a motion to substitute seven weeks past the scheduling order deadline.

As did the district court, the majority faults the Appellants for failing [**72] to more actively pursue discovery on the front end of the case regarding the other officers involved in the pursuit. Fair enough, but here again, some context helps to soften the blow. Specifically, as emphasized at oral argument, while the Appellants suspected that other officers were involved in the alleged conspiracy following Cook's death, they also believed that Howard and Green were the officers who initially pursued Cook--and this belief was not without reason.

Shortly after Cook's death (but before filing suit), the Appellants requested that the BCPD preserve and produce certain documents related to the incident, and in response, the BCPD provided a copy of the motor vehicle accident report and the police department's incident report. It was these documents that identified Howard as the reporting officer and Green as the officer who initially pursued Cook on foot. Thus, the only documents the BCPD provided before the Appellants filed suit suggested that Officers Howard and Green were properly-named defendants, and said nothing of Officers Fried and Choi's involvement in the pursuit. It was not until the BCPD's disclosure on November 22, 2010--which included reports from Officers [**73] Fried and Choi dated August 14, 2007--that the Appellants learned otherwise.

Moreover, it is not clear to me, as the majority asserts, that the Appellants "almost certainly could have ascertained [Officers Fried and Choi's] presence

significantly earlier than they did." Maj. Op. at 30. For

significantly earlier than they did." Maj. Op. at 30. For example, although Officer Howard's answer to interrogatories listed Officers Fried and Choi as present at the scene, he does not assert that they were involved in the pursuit. And in his later deposition, Officer Howard agreed that he "did not recognize" Officer Fried, J.A. 733, and did not know Officer Choi.[3] Further, **[\*830]** although Officer Bradley testified in his deposition that he told Cook's fiancée shortly after the incident that he "saw" Officers Fried and Choi at the scene, id. 499, Cook's fiancée stated in her answer to interrogatories only that Officer Bradley indicated that "two of his co-workers were already there" when he arrived, id. 859.

> 3    Admittedly, Green testified at his deposition that Choi was among the officers who responded to the scene where Green was with Cook's body, and that he ultimately learned that Officer "Freel or Fried, I believe" was pursuing Cook that day, and that "Officer **[\*\*74]** Choi may have assisted." J.A. 828. Such vague statements, however, do not suggest that the Appellants "almost certainly could have ascertained [Officers Fried and Choi's] presence significantly earlier than they did." Maj. Op. at 30. Indeed, even when presented with a photograph of Officer Fried, the most Officer Green could say was that "[i]t looks like it could be [the officer who pursued Cook]," but that he was "not sure." J.A. 829-30.

But even conceding that the Appellants should have been more conscientious in pursuing discovery, I think it necessary to consider their shortcomings against the backdrop of the district court's error on the motion to quash. On that score, it bears repeating that the

documents disclosed on November 22, 2010 fell well within the ambit of the Appellants' first three requests for production of documents, and that had the district court not quashed the request for these relevant documents, the Appellants would have learned of Officers Fried and Choi's involvement in the pursuit by at least October 15, 2010, if not sooner. It is conceivable then that the Appellants might have been able to comply with the district court's deadline in the scheduling order **[\*\*75]** for amending the pleadings, or at worse have been a few days beyond it, thus making the "good cause" analysis a far closer question.

In short, I believe that justice requires the district court to consider anew its "good cause" determination on the motion to substitute, in light of its failure to consider the full breadth of its discretion on the motion to quash, and the resulting impact on the Appellants' ability to timely discover the relevant facts warranting an amendment to their pleadings.[4]

> 4    In a footnote accompanying its order denying relief on the motion to substitute, the district court suggests that the Appellants' attempts to join Officers Friend and Choi might well have been futile under *Federal Rule of Civil Procedure 15*. The district court, however, never reached the merits of the proposed amendment under *Rule 15*, and neither do I.

III.

For the reasons set forth above, I dissent from Part II.B of the majority opinion.