# Exhibit 19

STATE OF SOUTH CAROLINA ) COURT OF COMMON PLEAS
           ) CIVIL ACTION NO.: 2011-CP-10-8609
COUNTY OF CHARLESTON )
           )
JOHN DOE,       )
           )
    Plaintiff,   )
           )
vs.         )
           ) **PLAINTIFF'S RESPONSE IN**
MICHAEL ARPAIO AND THE ) **OPPOSITION TO THE CITADEL'S**
CITADEL,      ) **MOTION FOR SUMMARY JUDGMENT**
           )
    Defendants,  )
           )
_____)

   PLAINTIFF JOHN DOE, by and through his undersigned counsel, respectfully submits the following Memorandum of Law in Opposition to Defendant The Citadel's Form Motion for Summary Judgment.

<u>**INTRODUCTION**</u>

   On November 18, 2011, Plaintiff John Doe filed the instant action against The Citadel and Citadel Summer Camp Counselor Michael Arpaio.  Judge Roger Young signed a Scheduling Order on January 17, 2013, setting the deadline for filing dispositive motions in this matter as July 15, 2013.  (Exhibit 1, Consent Scheduling Order).  On February 14, 2014, Defendant The Citadel filed a form motion for summary judgment without any accompanying memorandum of law, or with any legal basis for the motion beyond several conclusory sentences.

   This is an action involving the sexual assault and sexual molestation of the Plaintiff which occurred within the barracks of The Citadel in the year 2000 when the Plaintiff was 10 years old.  In its form motion, The Citadel moves for summary judgment on the grounds that the two year statute of limitations found in the South Carolina Tort Claims Act bars the Plaintiff's claim.  In so doing, The Citadel apparently contends that South Carolina Code Section 15-3-555, which expressly provides that minor victims of sexual assault may file suit up to the point of

their 27th birthday, should somehow not apply. It is undisputed that the Plaintiff was 22 years old at the time this action was filed in 2011, and therefore at least five years within the first prong of the tolling provisions set forth within S.C. Code Section 15-3-555.

The Citadel has yet to file a memorandum of law explaining its motion, and the Plaintiff expressly reserves the right to file a supplemental response brief after such time as The Citadel explains the basis of its form motion.

## FACTS

As set forth in detail below, The Citadel operated a summer camp for children aged 10-15 years old which was held during two three-week sessions every summer. Between the years 1995 and 2006, The Citadel Summer Camp harbored multiple serial child rapists, who used the camp to prey on young children. Unfortunately, the gruesome experience of the Plaintiff was far from isolated.

## Abuse of the Plaintiff

Throughout the late 1990s, the Plaintiff's family and extended family received promotional materials from the camp. In 2000, the Plaintiff attended the Citadel Summer Camp. At the time of his attendance, the Plaintiff was 10 years old, and therefore within the youngest age group of campers who were permitted to attend the Summer Camp. (Confidential Exhibit[1] 1, Deposition of the Plaintiff at Page 58, Lines 4-6). The Plaintiff testified that his time at The Citadel Summer Camp in the year 2000 was the first time in his life that he had been away from his parents for any period of time whatsoever. (Confidential Exhibit 1, Deposition of the Plaintiff at Page 60, Lines 1-8).

---

[1] The nine exhibits cited herein as "Confidential Exhibits" consist of deposition transcripts which have been designed and/or produced as "Confidential" given the sensitive nature of the subjects contained therein, as well as the mention of the names of minor victims of sexual abuse. All Exhibits listed as "Confidential Exhibits" have been produced directly to the Court for In Camera review.

Shortly after the Plaintiff arrived at The Citadel Summer Camp, he came into contact with counselor Michael Arpaio. During the Plaintiff's first week of camp, Michael Arpaio was performing his required tasks of monitoring the minor campers as they took their daily showers. On the day in question, counselor Michael Arpaio directed the Plaintiff into one of the few private shower stalls. Though he was actively engaged in the process of performing his duties of proctoring the children taking their daily showers, counselor Arpaio entered the private shower with the then ten-year-old Plaintiff and removed his clothing. While in the shower, counselor Arpaio forced the Plaintiff to fondle him, and forced the Plaintiff to allow counselor Arpaio to perform oral sex upon the Plaintiff. (Confidential Exhibit 1, Deposition of the Plaintiff at Page 67, Lines 2 through Page 69, Line 24).

Several days later, counselor Arpaio was performing his required job duty of supervising the children after "lights out," one of the most important safety roles in the camp During his shift, counselor Arpaio gave the Plaintiff a direct order to join Arpaio in his room within The Citadel's barracks. While in the room, counselor Arpaio forcibly sodomized the Plaintiff. (Confidential Exhibit 1, Deposition of the Plaintiff at Page 74, Lines 4 through Page 76, Line 15).

Shortly thereafter, counselor Arpaio made one final attempt to intimidate the Plaintiff into joining him in The Citadel barracks by approaching the Plaintiff while he was having supper in the mess hall and commanding the Plaintiff to meet counselor Arpaio in the barracks, however the Plaintiff did not comply with counselor Arpaio's directive but instead spent the entire night awake and terrified, and was astonished that no punitive action was taken against him immediately. (Confidential Exhibit 1, Deposition of the Plaintiff at Page 84, Line 21 through Page 86, Line 7). On the final occasion in which the Plaintiff encountered counselor Arpaio, Arpaio entered the Plaintiff's room within the barracks in an attempt to coerce and intimidate the

3

Plaintiff to prevent the Plaintiff from discussing his molestation with any other adults or family members. During this time, Arpaio forcibly assaulted the Plaintiff, and scattered his personal belongings in an attempt to intimate him and secure his silence. (Confidential Exhibit 1, Deposition of the Plaintiff at Page 86, Line 8 through Page 87, Line 11). No Citadel staff inquired with the Plaintiff regarding the source of his split lip.

### The Citadel Summer Camp

From 1957 until 2006, The Citadel operated a Summer Camp for children aged 10-15 years old on the campus of its school. The Summer Camp held two three-week sessions per summer, during which time the minor campers attending the camp were in the care, custody, and control of the Citadel, as confirmed by the Director of The Citadel Summer Camp. (Exhibit 2, 10/06/04 Bates Depo at Page 143, Lines 18-25, Page 144, Lines 1-6). The Citadel marketed this camp to children and parents throughout the United States, and charged each camper a minimum $1,157 to attend the camp. The Summer Camp generated revenues for the school in excess of $500,000.00 annually.

In the years leading up to the Plaintiff's attendance, counselor Michael Arpaio worked within the camp in various counselor capacities. In these years, Arpaio exhibited clear, open, and obvious signs of sexual deviance. The record, as established through the depositions taken in this case and in the companion cases, is replete with references to the open and obvious practices of sexual deviance and sexual perversion exhibited by Arpaio and his fellow counselors in the years leading up to the abuse and rape of the Plaintiff. One such example occurred during a 1998 Summer Camp session in which counselor Arpaio was seen by numerous *Camp staff members,* and campers while he was having illegal sexual intercourse with a female member of the Citadel Summer Camp staff on the hood of a car, in public, and on the campus of the Citadel Summer Camp, (Exhibit 3, Deposition of Victim No. 1 (Redacted) at Page 182, Lines 12-15,

4

Page 183, Lines 22-25; Page 184, Lines 1-5); (Exhibit 4, Deposition of Victim No. 2 (Redacted) Page 97, Lines 2-21).    During this display of illegal public fornication and reckless sexual exhibitionism by Arpaio, several Citadel employees actually charged minor Citadel Summer campers a monetary admission fee of $5.00 per person to witness Arpaio's illegal and sexually deviant behavior from certain favorable vantage points upon the campus of the Citadel Summer Camp, (Exhibit 3, Deposition of Victim No. 1 (Redacted) at Page 182, Lines 12-15, Page 183, Lines 22-25; Page 184, Lines 1-5); (Exhibit 4, Deposition of Victim No. 2 (Redacted) at Page 97, Lines 5-21). These staff members could not have arranged to charge admission fees unless they had advance knowledge that Arpaio would engage in this conduct.

Counselor Arpaio held his proclivities for sexual perversion out to the entire staff of The Citadel Summer Camp throughout his tenure at the Citadel Summer Camp, including in the 5 years preceding the 2000 summer camp session. *See* (Exhibit 5, Deposition of Robert Lyon at Page 112, Lines 9-23; Page 121, Lines 14-25; Page 122, Line 1; Page 167, Lines 18-22) (discussing the flagrant violations of the anti-alcohol and anti-cohabitation policies, discussed below, witnessed during Lyon's tenure within the camp between 1995 and 2001).    Specifically, Arpaio previously had been seen, and was known to, publically grab and/or fondle the genitals of numerous minor campers in the public spaces of the Citadel Summer Camp multiple times per day, each and every day camp was in session, (Exhibit No. 4, Deposition of Victim No. 2, Page 89, Lines 6-25, Page 90, Lines 1-25; Page 91, Lines 1-6); (Exhibit No. 3, Deposition of Victim No. 1, Page 200, Lines 2-23; Page 362, Lines 2-10).    As another specific example of counselor Arpaio's open display of his illegal and suspicious sexual proclivities and activities — activities and proclivities that were open, obvious, and either noticed by or clearly noticeable to camp staff — counselor Arpaio would frequently and in public lick the faces and ears of minor campers he was attracted to throughout the camp activities, and would attempt to kiss the faces and lips of

some campers. (Exhibit No. 4, Deposition of Victim No. 2, Page 91, Line 7; Page 108, Lines 23-25, Page 109, Lines 1-11). One camper testified that Arpaio's licking was open and obvious, that is, that Arpaio's "licking in the ear, licking in the face, this was all over the place." (Exhibit No. 4, Deposition of Victim No. 2, Page 103, Lines 20-21). Camp Staff also had actual knowledge that Arpaio would openly and obviously engage campers in sexually inappropriate, illegal or suspicious public wrestling matches in which he would grab the genitals of campers and force campers to grab his genitals. These inappropriate, illegal, or suspicious — and highly public — wrestling matches would occur "[o]n the quad, on the grass, in his room, everywhere," and also were specifically viewed within Arpaio's room on various occasions by the Camp's Safety and Education Officer (Robert Lyon) and Deputy Director (Jennifer Garrott). (Exhibit No. 3, Victim No. 1 Depo at Page 191, Lines 14-25; Page 192, Lines 1-24; Page 200, Lines 2-23; Page 362, Lines 11-13). During the deposition of U.S. Marine Corps Major Phillip Harward, who was the Naval Judge Advocate General ("JAG") Officer ultimately in charge of both the initial criminal investigation into counselor Arpaio's conduct and the criminal court martial[2] of counselor Arpaio (a court martial that concluded with Arpaio's conviction), Major Harward was shown a photograph of one of these wrestling sessions within the barracks of the Citadel of the same nature as those which occurred in the presence of Citadel Summer Camp staff members Robert Lyon and Jennifer Garrott. Major Harward confirmed that the activity depicted in the photograph alone would require and would be sufficient to support a criminal court martial of Arpaio for conduct unbecoming an officer. (Exhibit 6, Major Harward Deposition at Page 93, Lines 1-16; 94, Lines 16-22). However, this illegal and suspicious conduct was accepted as completely acceptable, unobjectionable, and normal by the staff of The Citadel Sumer Camp.

---

[2] During the time period in which counselor Arpaio served as a camp counselor between the years 1997 and 2001, Arpaio was also a member of the United States Marines. As such, the United States Navy had jurisdiction for the criminal proceedings against counselor Arpaio.

In the years leading up to the molestation of the Plaintiff, The Citadel Summer Camp had in place an anti-cohabitation policy forbidding campers and counselors from being in the same room after lights out. The anti-cohabitation policy, attached hereto as Exhibit 7, in simplest terms, expressly forbid minor campers (such as the Plaintiff) and adult counselors and staff (such as counselor Arpaio) from co-habiting with each other and from sleeping in each other's beds and rooms -- at any time, for any duration, and for any reason, justification, or excuse. The anti-cohabitation policy admitted no exceptions and allowed for no extenuating circumstances. To assist in the proper implementation of the anti-cohabitation policy, campers and counselors were supposedly required to be in their own rooms at "lights out," (Exhibit 8, Major General Grinalds' Depo at Page 71, Lines 5-20); (Exhibit 9, Brigadier General Mace Depo at Page 99, Lines 18-25; Page 100, Lines 1-4). Proper and effective enforcement of the anti-cohabitation policy was a simple task, easily accomplished with minimal supervision, given that for the single Citadel barracks in which all of the minor campers were housed, supervisors "can stand in one place right in the center and see virtually every room." (Exhibit 8, Major General Grinalds' Depo at Page 46, Line 25, Page 47, Lines 1-2). However, between 1995 and the assault on the Plaintiff, this policy was flippantly disregarded despite the obvious fact that the nighttime hours provided the greatest risk for inappropriate physical and sexual contact between the minor campers and the adult counselors who lived amongst the children in the unlocked barracks.

Despite the existence of these policies, a simple stroll to the bathroom in the middle of the night would show the barracks teeming with campers and counselors spending lengthy periods of time in the same rooms. (Exhibit 3, Victim No. 1 Depo at Page 170, Lines 19-25; Page 171, Lines 1-15). Former Camp Supervisor Colonel John Lackey recently testified that The Citadel was never able to properly enforce this critically important safety policy *between the years of 2000 and 2006*. (Confidential Exhibit 2, 06-26-13 Colonel Lackey Depo, Volume II at

7

Page 312, Lines 1-25; Page 313, Lines 1-18). During these after-hours activities, campers participated in illicit activities under the supervision of and with the participation of The Citadel's staff of counselors to include group masturbation sessions, or "biscuit parties," during which minor campers were forced to ingest semen. (Exhibit 3, Victim No. 1 Depo at Page 92, Lines 11-25; Page 93, Lines 1-2). Camp staff further had constructive knowledge that in the years leading up to the rape of the Plaintiff, counselor Arpaio would take advantage of and use the nighttime hours, after regularly scheduled camp sessions and activities had concluded, to massage and fondle the bodies of minor campers in his room, oftentimes in an illegally or suspiciously inappropriate and sexual manner, (Exhibit 3, Victim No. 1 Depo at Page 80, Lines 20-25; Page 81, Lines 1-8; Page 106, Lines 8-16; Page 113, Lines 7-25; Page 114, Lines 1-10; Page 115, Lines 18-25), (Exhibit No. 4, Victim No. 2 Depo at Page 124, Lines 21-25 Page 125, Lines 1-17). Counselor Arpaio also frequently and openly made use of the hours after regularly scheduled camp sessions and activities had concluded to show explicitly pornographic movies to minor campers in the presence of other members of the Citadel Summer Camp staff. (Exhibit No. 4, Victim No. 2 Depo at Page 93, Lines 13-24), (Exhibit No. 3, Victim No. 1 Depo at Page 84, Lines 7-17; Page 99, Lines 16-25; Page 100, Lines 1-10; Page 102, Lines 20-25; Page 103, Lines 1-3).

In addition to participating in illicit after-hours activities, counselor Arpaio also made no secret that he shared his bed within The Citadel's barracks with children on a nightly basis in the years leading up to the rape of the Plaintiff. A victim identified herein as Camper No. 3 testified that throughout the entire time he attended a 1997 Citadel Summer Camp session, he spent the night in Defendant Arpaio's room on a nightly basis. (Exhibit No. 10, Camper No. 3 Depo at Page 20, Lines 8-16). Camper No. 3 further testified that his cohabitation with Arpaio during these weeks in 1997 was open and obvious, and that he regularly was, and routinely could be,

8

seen leaving Arpaio's room on a daily basis each morning after the cohabitation occurred, (Exhibit No. 10, Camper No. 3 Depo at Page 90, Lines 1-12), and that the anti-cohabitation policy was violated on a nightly basis. (Exhibit No. 10, Camper No. 3 Depo at Page 99 at Lines 1-12). Camper No. 3 also testified that the cohabitation between counselors and staff was plainly visible to the supervisory staff of camp officers who were known to be in the barracks at times at which this occurred, (Exhibit No. 10, Camper No. 3 Depo at Page 100, Lines 24-25; Page 101, Lines 1-12). Camper No. 3 further testified that during his time attending one of the subsequent 1998 Citadel Summer Camp sessions, Arpaio moved into a room within the Barracks with then-Senior Counselor Robert Lyon on the first floor, which placed counselors Arpaio and Lyon on the floor with the youngest, most vulnerable group of campers. (Exhibit No. 10, Camper No. 3 Depo at Page 79, Lines 14-24). Camper No. 3 testified that nearly every one of the frequent times during his 1998 Citadel Summer Camp session that he went to the Barracks room occupied by counselors Arpaio and Lyon, he directly witnessed minor campers present in the room, in violation of camp policy. (Exhibit 10, Camper No. 3 Depo at Page 113, Lines 8-14).

Additional camp employees testified that counselor Arpaio openly and obviously violated the Citadel Summer Camp's anti-cohabitation and anti-alcohol policies on a daily basis between the years of 1997 and 2001. (Exhibit 11, Daly Depo at Page 46, Lines 1-16; Page 47, Lines 2-8; Page 48, Lines 6-13, 19-24; Page 49, Line 1). Citadel Summer Camp Counselor Anna Daly testified that during the 1998 Citadel Summer Camp sessions, she also witnessed Arpaio's open and obvious practice of sleeping with minor Summer Campers in his Citadel Barracks room on a nightly basis. (Exhibit 11, Daly Depo at Page 46, Lines 1-16; Page 47, Lines 2-8; Page 48, Lines 6-13, 19-24; Page 49, Line 1).

A prior litigant, identified herein as Victim No. 2, testified that that he spent the night sleeping in Arpaio's room on a regular basis throughout the 1998 Citadel Summer Camp

9

sessions, and that this practice was open and obvious to all who worked at the camp, including then-Senior Counselor Robert Lyon who was actually present *within* the room on certain occasions. (Exhibit No. 4, Victim No. 2 Depo at Page 149, Lines 11-25; Page 150, Lines 1-15). Victim No. 2 also testified that cohabitation between campers and counselors during the 1998 Citadel Summer Camp Session was common, and involved counselors and camp officers other than just Arpaio and Lyon. (Exhibit No. 4, Victim No. 2 Depo at Page 88, Lines 12-19). An additional victim, identified herein as Victim No. 1, testified that other counselors and the Deputy Director of the Summer Camp (Jennifer Garrott) witnessed other campers, including himself, spending the night sleeping in Arpaio's bed on a regular basis during the 1998 Citadel Summer Camp session. (Exhibit No. 3, Victim No. 1 Depo at Page 104, Lines 14-19; Page 109, Lines 1-8; Page 111, Lines 21-25; Page 112, Lines 1-25, Page 113, Lines 1-2; Page 175, Lines 20-25, Page 176, Lines 1-4; Page 177, Lines 1-25; Page 178, Lines 1-6; Page 205, Lines 10-19).

Other major red flags indicating a level of sexual perversion present in the camp abounded in the years leading up to the rape of the Plaintiff. During counselor Arpaio's tenure at the camp, campers reported to the Citadel medical office with bizarre and unexplained genital injuries and/or abrasions. Although the medical staff was legally required to report these injuries to child welfare and/or law enforcement authorities, these injuries were not investigated, acted upon, or properly reported to any off-campus authorities by either the Citadel medical staff or non-medical Citadel. (Exhibit 6, Major Harward Depo at Page 72, Lines 1-18). Citadel staff also knew that other counselors, beyond just Arpaio, participated in open and obvious activities indicating sexual perversion. For example, during the 1997 and 1998 Citadel Summer Camp Sessions, several counselors were known to tie naked campers down in the shower as a form of hazing, (Exhibit No. 4, Victim No. 2 Depo at Page 142, Line 18-25, Page 143, Lines 1-10), as well as force campers to engage in "cage matches" with counselors in which campers were

10

forced into locked rooms with counselors who would then wrestle and grab the genitals of campers until they could no longer endure the pain and embarrassment. (Exhibit No. 4, Victim No. 2 Depo at Page 143, Lines 11-25; Page 144, Line 1-19). Most shockingly, however, were the group masturbation sessions or "biscuit parties" referenced above. (Exhibit 3, Victim No. 1 Depo at Page 92, Lines 11-25; Page 93, Lines 1-2).

The acts of several executive level employees of the Citadel Summer Camp staff were particularly egregious, and possibly criminal. Then-Deputy Director Jennifer "Jenni" Garrott (who later became the Director of the Citadel Summer Camp) and Safety and Education Officer for the year 2000 Robert Lyon are said to have been present for many of the sexually inappropriate wrestling matches between counselor Arpaio and minor children. (Exhibit No. 3, Victim No. 1 Depo at Page 191, Lines 14-25, Page 192, Lines 1-24; Page 200, Lines 2-23; Page 362, Lines 11-13). Garrott had actual knowledge that camp polices and criminal statutes regarding the serving of alcohol to minors were being violated, that Defendant Arpaio was providing alcohol to minor campers, and that Arpaio was cohabitating with minor campers whom he had provided alcohol to as early as 1998, or two years prior to the sexual assaults on the Plaintiff. (Exhibit 3, Deposition of Victim No. 1 at Page 177, Lines 1-25; Page 178, Lines 1-11; Page 179, Lines 11-25; Page 180 Lines 5-22). Victim No. 1 cites numerous occasions during which Deputy Director Garrott actually walked in on Arpaio's inappropriate conduct, to include inappropriate sexual wrestling, open use of alcohol by minors, and the overnight cohabitation of minors in the bed of Arpaio. On one such occasion, Defendant Garrott was herself said to be visibly intoxicated, (Exhibit 3, Deposition of Victim No. 1 at Page 192, Lines 6-22; Page 205, Lines 16-23; Page 214, Lines 9-14; Page 341, Lines 21-25, Page 342, Lines 1-10). Other counselors recalled Garrott's tendencies to visit the barracks, despite her supervisory role and duty to safeguard the wellbeing of the over 200 children in the care and custody of The Citadel

11

per camp session, only after participating in highly inappropriate drinking excursions with the college-age female members of the staff of counselors. (Exhibit 11, Daly Depo, Page 81, Lines 20-24; Page 82, Lines 1-7, Page 37, Lines 4-14). Victim No. 1 testified that other counselors and Deputy Director Garrott actually witnessed other campers, including himself, spending the night sleeping in Arpaio's bed on a regular basis during the 1998 Citadel Summer Camp session. (Exhibit No. 3, Victim No. 1 Depo at Page 104, Lines 12-19; Page 109, Lines 1-8; Page 111, Lines 21-25; Page 112, Lines 1-25, Page 113, Lines 1-2; Page 175, Lines 20-25, Page 176, Lines 1-4; Page 177, Lines 1-25; Page 178, Lines 1-6; Page 205, Lines 10-19).

The activities of Robert Lyon, Safety and Education Officer for the year 2000, are even more troubling. Defendant Lyon served as the senior counselor for the Summer Camp in 1998, a position that afforded considerable control over the Citadel Summer Camp. (Exhibit 8, Depo of General Grinalds at Page 62, Lines 12-18). In 1999 and 2000 Lyon was promoted to positions affording even greater control over the camp, first as the Personnel and Administrative Officer for 1999 and then as the Safety and Education Officer for 2000. Prior to the summer of 2000, the Citadel withdrew its offer of employment to Lyon over concerns that he had embezzled Citadel Summer Camp funds. However, at the insistence of Camp Director Major Bates, the Citadel re-extended its offer of employment to Lyon, and Lyon returned to the Citadel Summer Camp as the Safety and Education Officer for the year 2000. Like Deputy Director Garrott, Safety Officer Lyon was said to have directly witnessed much of the inappropriate conduct with minors. One camper confirms that Rob Lyon walked into the room, which he shared with Defendant Arpaio in 1998, and saw that Arpaio was showing pornography to children. (Exhibit No. 4, Victim No. 2 Depo at Page 157, Lines 17-21). Lyon roomed with counselor Arpaio in 1998, and was physically present while counselor Arpaio shared his bed with children. (Exhibit No. 4, Victim No. 2 Depo at Page 149, Lines 11-25; Page 150, Lines 1-15; Page 158, Lines 21-

12

25; Page 159, Lines 1-6); *see also* (Exhibit 11, Daly Depo at Page 46, Lines 1-16; Page 47, Lines 2-8; Page 48, Lines 6-13, 19-24; Page 49, Line 1).  Lyon knew that alcohol was being served to children within the camp frequently, and one camper testified "Rob Lyons for sure saw us. Definitely saw us getting drunk." (Exhibit No. 3, Victim No. 1 Depo at Page 375, Lines 9-11).

Most shockingly, Lyon visited Arpaio's residence in Emerald Isle, North Carolina, in the summer of 1998 (or two years prior to the preventable rape of the Plaintiff) wherein Lyon witnessed Arpaio serving alcohol to minor campers of the Citadel Summer Camp to the point of intoxication.  Further, Lyon witnessed Arpaio removing the clothing of the intoxicated minor campers during this visit, and Lyon is actually depicted in photographs with naked children confirming his presence during these events. (Exhibit 11, Daly Depo at Page 60, Lines 11-19; Page 61, Lines 9-20; Page 62, Lines 11-18; Page 64, Lines 18-23; Page 66, Lines 10-12; Page 69, Lines 16-22; Page 70, Lines 14-22; Page 71, Lines 8-21; Page 73, Lines 7-11, 18-22)[3].  As such, Lyon, prior to serving as Safety and Education Officer for the year 2000, had actual knowledge of Arpaio's sexual proclivities towards minors but, incredibly, took absolutely no action to protect the safety of minor Citadel Summer Campers, including the Plaintiff, who suffered multiple sexual assaults and molestations inside the Citadel Summer Camp in 2000.

## Citadel's Response

In the first summer camp session of 2001, after reporting abuse to counselor Ashley Lyons and being informed that it was a dream, a brave minor victim ultimately reported counselor Arpaio's inappropriate sexual conduct to his parents who had come to the campus to view the camp's graduation exercises.  Shortly thereafter, the Charleston Police Department initiated an investigation, which was wholly thwarted, in part, by the lies/denials of Citadel

---

[3] The photographs referenced within this deposition excerpt have been designated as exhibits to the original deposition. These photographs have not been appended hereto due to their sensitive nature, but are incorporated herein by reference. These photographs can be supplemented to the Court's record upon request should the Court deem necessary.

13

Summer Camp counselor Ashley Lyons. (Exhibit 6, Major Harward Deposition, Volume II at page 80, Lines 15-25; Page 81, Lines 1-3, 12-25; Page 82, Lines 1-15) (Confidential Exhibit 2, 06/26/13 Colonel Lackey Depo, Volume II at Page 317, Lines 7-25; Page 318, Lines 1-3) (Confidential Exhibit 3, 10-29-13 Major Bates Depo, Volume I at Page 44, Lines 10-18). Prior to closing their file, the CPD investigating officer issued a letter to The Citadel detailing the flagrant violations of the anti-cohabitation policies which he had uncovered, and stating that "I am sure that these activities will be addressed and corrected in the future." (Confidential Exhibit 5, 10-31-13 Major Bates Depo at Page 288, Lines 17-25). Camp Director Major Bates recently agreed that these activities were never addressed in the interest of preventing minor campers from being further sexually molested and abused. (Confidential Exhibit 5, 10-31-13 Major Bates Depo at Page 289, Lines 3-7). In late 2001, the Naval Criminal Investigative Service began an investigation into counselor Arpaio's conduct on the campus of The Citadel. Incredibly, not only did Safety Officer and Education Officer for the year 2000 Robert Lyon fail to protect the rights of minor campers, including the Plaintiff, to be free from sexual abuse, Lyon actually attempted to impede the criminal investigation and subsequent United States Naval Court Martial into counselor Arpaio's conduct. U.S. Marine Corps Major Phillip Harward, who was the Naval Judge Advocate General ("JAG") Officer in charge of both the initial criminal investigation into counselor Arpaio's conduct and the criminal court martial of Defendant Arpaio (a court martial that concluded with Arpaio's conviction), testified that Lyon was a "classic example" of someone who was "very uncooperative" with a criminal investigation, and that "I wouldn't believe half of what Mr. Lyons said." (Exhibit 6, Major Harward Depo at Page 36, Lines 14-25, Page 37, Lines 1-4). Despite the barrier erected by members of The Citadel staff including Robert Lyon and Ashley Lyons, counselor Arpaio ultimately pled guilty to the United States Navy Court Martial in 2003. Following his release from the brig, counselor Arpaio relocated to

14

Puerto Rico where he was subsequently indicted by the United States Attorney for the District of Puerto Rico for conspiracy to commit murder, aiding and abetting with intent to cause death or serious bodily harm, brandishing a firearm, disposing of a cadaver, conspiracy to injure, oppress, threaten and intimidate, and unlawful search and seizure of a private person. Counselor Arpaio subsequently pled guilty to federal charges of aiding and abetting and is currently serving a 151-month federal sentence within a United States Bureau of Prisons facility in Florida.

In the aftermath of the Arpaio investigation, the Citadel made a conscious and deliberate decision not to notify the parents of the minors who had been exposed to counselor Arpaio, including the Plaintiff's parents, despite actual knowledge that the majority of child sexual assault victims never report such abuse until adulthood. Further, as discussed below, The Citadel actively engaged in attempts to prevent the families of those exposed to counselor Arpaio from finding out about the abuse. Former Deputy Director/Director of the Summer Camp Jennifer Garrott recently confirmed that the decision not to notify the families of the potential victims was the wrong decision. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 101, Lines 16-25; Page 102, Lines 1-10).

Tragically, the Citadel continued to harbor another serial child rapist, Louis Reville, within its Summer Camp in the camp sessions immediately following counselor Arpaio's departure from the camp. In fact, in 2002 Reville was placed in control of the barracks, where he began his own depraved pattern of conduct modeled after that of counselor Michael Arpaio. (Confidential Exhibit 5, 10-31-13 Major Bates Depo at Page 392, Lines 13-25; Page 393, Lines 1-2). As has been widely reported, The Citadel actively concealed reports of abuse at the hands of Reville even after a young victim, uncharacteristically, came forward in 2007 to report his abuse. The Citadel's intentional concealment of reports of sexual abuse became public when

15

Reville was arrested on charges of molestation just days before the filing of this action, thereby
exposing the years of concealment by The Citadel of child sexual predators within its barracks.

## SUMMARY JUDGMENT STANDARD

Pursuant to South Carolina Rule of Civil Procedure 56(c), summary judgment is proper
only if there is no genuine issue of material fact and the moving party is entitled to judgment as a
matter of law. *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002).

## ARGUMENT

## I.    The Citadel has Waived the Statute of Limitations Defense

It is axiomatic that a party can waive a statute of limitations defense by their conduct.
*City of N. Myrtle Beach v. Lewis-Davis*, 360 S.C. 225, 234, 599 S.E.2d 462, 466-67 (Ct. App.
2004) (citing *McLendon v. South Carolina Dep't of Highways & Pub. Transp.*, 313 S.C. 525,
525-26, 443 S.E.2d 539, 540 (1994)).  Waiver is a question of fact for the finder of fact.  *Id.* at
235 (citing *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 307 S.C. 339, 415 S.E.2d
384 (1992)).  Thus, "'waiver may result from express agreement, ... from failure to claim the
defense, *or by any action or inaction manifestly inconsistent with an intention to insist on the
statute.*'" *Id.* (quoting *Mende v. Conway Hosp., Inc.*, 304 S.C. 313, 315, 404 S.E.2d 33, 34
(1991)) (emphasis in original).

As stated above, Judge Roger Young signed a Scheduling Order on January 17, 2013
setting forth the time periods within which the parties were to finalize this case for trial purposes.
The Plaintiff identified all experts and supplemented all discovery responses in accordance with
the Court's Scheduling Order.  The Plaintiff further insisted that the Court-ordered mediation
take place within the time period set forth by Judge Young.

During the 20 months within which the discovery period was open, the Plaintiff made
multiple offers to make himself and his timely disclosed witnesses available for deposition.

16

When The Citadel could not commit to one of the many dates offered to it to depose the Plaintiff within the Scheduling Order, the Plaintiff agreed, at the request of and as a courtesy to The Citadel, to appear for a deposition in the month following the expiration of the discovery deadline. The Plaintiff further agreed to work with The Citadel to schedule a trial date amenable to the parties and this Honorable Court as that deadline approached and ultimately passed. The Plaintiff did not, at any point, acquiesce or agree to revive deadlines within the Scheduling Order which had already expired. The most relevant date, of course, is the July 15, 2013 deadline for filing dispositive motions. (Exhibit 1). Again, Defendants did not file their bare-bones motion – a motion devoid of any legal briefing whatsoever that would put the Court or the Plaintiff on notice of the legal basis for their arguments – until February 14, 2014, to wit, seven months after the expiration of the deadline for filing dispositive motions.

The Citadel's failure to timely file their motion is telling. In none of the previous seven lawsuits involving victims of counselor Michael Arpaio did The Citadel raise a substantive statute of limitations defense. In the two and one half years during which time this case has been pending, The Citadel has at no time made any attempt to conduct any discovery whatsoever regarding the statute of limitations, the discovery rule, the existence, extent, or time period associated with any repressed memory of the Plaintiff, or the time period during which the Plaintiff realized that he had suffered injury and needed to vindicate his legal rights. The Citadel has neglected to depose the Plaintiff's psychologist, despite having been provided with an expert report of detailing the psychologist's findings on August 6, 2012. Further, The Citadel's own Freedom of Information response to a local newspaper contains e-mail statements of in-house counsel Mark Brandenburg indicating that because of the "'sexual abuse'" statute (S.C. Code Ann §15-3-555, discussed in detail below) counsel was "NOT optimistic that we can escape this

17

case[4], or others, based purely on the statute." (Exhibit 12, 2011 Citadel FOIA Response at p. 0000633) (emphasis in original). Citadel General Counsel Brandenburg further reiterated his belief that S.C. Code Ann §15-3-555 was the governing provision in a subsequent e-mail and letter to the South Carolina Insurance Reserve fund ultimately produced to the Post and Courier in the context of a FOIA response. (Exhibit 13) (Exhibit 14). Finally, The Citadel failed, until recently, to raise a substantive statute of limitations defense in any of the other pending cases in which The Citadel is alleged to have harbored convicted sexual predator Louis Reville, actions which have been pending since 2012.

The reason that The Citadel sat on their rights until seven months **after** the Court-ordered deadline for filing dispositive motions is apparent – The Citadel did not concoct the idea of filing such a motion until the trial date was impending and the school recognized that its actions cannot conceivably be defended on the merits. *See* (Confidential Exhibit 3, 10-29-13 Major Bates Depo, Volume I at Page 33, Lines 14-25; Page 34, Lines 1-25; page 35, Lines 1-4)(admitting to significant failures in the enforcement of camp policies resulting in multiple sexual assaults upon minor campers). This Court should recognize The Citadel's motion for what it is -- an unsupported and out-of-time attempt to evade liability in a case that cannot justifiably be defended on the merits. Even if this Court were to be inclined to grant The Citadel's motion based upon its assertion that S.C. Code Ann Section 15-3-555 is not the governing tolling provision, the record before this Court requires that the issue of waiver be submitted to the jury. *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 307 S.C. 339, 415 S.E.2d 384 (1992). As such, The Citadel's motion for summary judgment must be denied on this initial basis alone.

---

[4] Attorney Brandenburg was apparently referring to a case of sexual assault within the camp at the hands of counselor Louis Reville, who was convicted of molesting numerous students on and off of the campus of The Citadel Summer Camp in the years following the conviction of Michael Arpaio.

18

## II.    The Plaintiff's Complaint Was Timely Filed

The Citadel has moved for summary judgment based on the South Carolina Tort Claims

Act Statute of Limitations, S.C. Code § 15-78-10. Section 15-78-10 provides, in full:

> [e]xcept as provided for in [S.C. Code] Section 15-3-40, any action
> brought pursuant to this chapter is forever barred unless an action
> is commenced within two years after the date the loss was or
> should have been discovered; provided, that if the claimant first
> filed a claim pursuant to this chapter then the action for damages
> based upon the same occurrence is forever barred unless the action
> is commenced within three years of the date the loss was or should
> have been discovered.

As our Supreme Court explained,

> South Carolina law provides for tolling of the applicable
> limitations period by statute in certain circumstances. See S.C.
> Code Ann. § 15-3-30 (2005) (stating exceptions to the running of
> the statute of limitations when the defendant is out of the state); id.
> § 15-3-40 (providing exceptions for persons under a disability,
> including being underage or insane).

*Hooper v. Ebenezer Senior Servs. & Rehab. Ctr.*, 386 S.C. 108, 115, 687 S.E.2d 29, 32 (2009).

South Carolina Code Section 15-3-40 specifies that:

> [i]f a person entitled to bring an action mentioned in Article 5 of
> this chapter or an action under Chapter 78 of this title, except for a
> penalty or forfeiture or against a sheriff or other officer for an
> escape, is at the time the cause of action accrued either:
>
>    (1) within the age of eighteen years; or
>
>    (2) insane;
>
> the time of the disability is not a part of the time limited for the
> commencement of the action, except that the period within which
> the action must be brought cannot be extended:
>
>    (a) more than five years by any such disability, except
> infancy; nor
>
>    (b) in any case longer than one year after the disability
> ceases.

The TCA Statute of Limitations expressly incorporates S.C. Code Section 15-3-40's "tolling"

provision, which expressly provides "Exceptions as to persons under disability." Indeed, "both

19

Section 15-3-40 and Section 15-78-110" were simultaneously "amended" in 1988 by the same Act, "Act No. 352 §§ 1, 9, 1988 S.C. Acts 2638, 2644." *Searcy v. S.C. Dep't of Educ., Transp. Div.*, 303 S.C. 544, 549, 402 S.E.2d 486, 489 (Ct. App. 1991).

In 2001, our legislature enacted a new disability tolling provision, S.C. Code Section 15-3-555, one that broadly covers all "action[s] based on sexual abuse or incest." That provision expressly establishes that **any:**

> action to recover damages for injury to a person arising out of an act of sexual abuse or incest must be commenced within six years after the person becomes twenty-one years of age **or** within three years from the time of discovery by the person of the injury and the causal relationship between the injury and the sexual abuse or incest, whichever occurs later.

S.C. Code Ann. §15-3-555(A)(emphasis added). Section 15-3-555(A) is not limited to any particular type of claim or cause of action or any specific class of defendant. Nor does it provide an express exemption for certain kinds of defendants. Because Plaintiff's claims against The Citadel "to recover damages for injury to [his] person," *id.*, "ar[ose] out of [Arpaio's] act[s] of sexual abuse," *id.*, §15-3-555(A) afforded him two alternative deadlines by which he "must [have] commenced" his suit against The Citadel: *(1)* "within six years after [he] bec[a]me[] twenty-one years of age"; or *(2)* "within three years from the time of discovery by the person of the injury and the causal relationship between the injury and the sexual abuse." Section 15-3-555(A) also gave him the option of choosing "whichever [deadline] occurs later."

That sexual abuse tolling statute focuses precisely on one kind of special claimant, a person like the Plaintiff, whose lawsuit "aris[es] out of act of sexual abuse ...," a characterization that fits his experience, and the allegations of in his Complaint, far more closely than any other South Carolina tolling statute, rule, or provision, including both Section 15-3-40 and Section 15-78-110.

20

The Plaintiff's Complaint, ¶1, alleges, and The Citadel never has disputed, that he commenced his lawsuit on November 18, 2001, when he was "between the ages of twenty-one and twenty-six" which fits easily "within six years after [he] bec[a]me twenty-one years of age …." §15-3-555(A). As such, the Plaintiff facially satisfied the key requirement set by §15-3-555(A)'s first alternative tolling option. In addition, the evidence in this case will show that he also satisfied §15-3-555(A)'s second alternative "within three years from the time of discovery" tolling option.

Significantly, The Citadel fails to explain why it ignored §15-3-555(A), or explicate why it evidently believes §15-3-555(A) is somehow irrelevant and inapplicable. The Citadel's silence is telling. Indeed, the only limitations and tolling provisions The Citadel references in its motion are S.C. Code §15-78-110, which The Citadel explicitly cites and which applies to claims brought under the state's Tort Claims Act, and S.C. Code §15-3-40, which is cross-referenced in §15-78-110 and which is an earlier and more general tolling exception for all minor tort victims, one that is notably shorter in length than the tolling exception the South Carolina legislature enacted in 2001 for the benefit of a small and special class of the most vulnerable, unfortunate, and unenlightened tort victims—minors whose injuries and claims arose from sexual abuse. For these reasons, §15-3-555(A) tolled §15-78-110's statute of limitations on Plaintiff's claims, which meant the latter had not expired when he filed suit.

The Citadel may contend that §15-3-555(A)'s twin tolling provisions are inapplicable because Doe was sexually abused in 2000, a year before §15-3-555(A) was enacted by S.C. 2001 Act No. 102, §3. In so arguing, The Citadel most likely would rely on the general "presumption that [all] statutory enactments are to be given prospective rather than retroactive effect." *Jenkins v. Meares*, 302 S.C. 142, 146, 394 S.E.2d 317, 319, (S.C. 1990).

21

The Citadel's argument still would fail because the general "presumption" of prospectively is trumped by the well-recognized "exception to this presumption [which] arises when the enactment is remedial or procedural in nature, such as a statute of limitations" or a tolling provision. *Jenkins*, 302 S.C. at 146, 394 S.E.2d at 319. See *Cannon v. Johnson, Lane, Space, Smith & Co.*, 638 F.2d 12, 13-14 (4th Cir. 1980). Although a legislature may express its intent that a new tolling provision or statute of limitations should apply only prospectively, *Jenkins*, 394 S.E.2d at 319, nothing in §15-3-555(A)'s text or legislative history evidences such intent by the South Carolina General Assembly.[5]

Although even a statute intended to operate retroactively generally cannot revive an already time-barred claim, *Goff v. Mills*, 279 S.C. 382, 386, 308 S.E.2d 778, 780 (S.C. 1983),[6] clearly none of Doe's claims that "ar[o]se" upon his sexual abuse in 2000 had not been barred by §15-78-110's two-year statute of limitations when §15-3-555(A) was enacted in 2001. As such, the latter statute merely extended the pre-existing statue of limitations' deadline for filing his claims.

The Citadel may contend that the tolling provision established by §15-3-40 provides the exclusive exception to§15-78-110's two-year statute of limitations, simply because §§15-78-110 cross-references §15-3-40. Such an argument also flies in the face of S.C. Code §15-3-60, which specifically allows claimants to accumulate or combine any or "all" of multiple exceptions or "disabilities." Thus, "[w]hen two or more disabilities shall coexist at the time the right of action

---

[5] S.C. Code Ann. §15-3-545(C), which applies solely in medical malpractice cases, demonstrates that the General Assembly knows how to draft a tolling statute that operates prospectively and not retroactively. Thus, §15-3-545(C) clearly states "[t]he provisions of this [medical malpractice tolling] section apply only to causes of action which arise **after** June 10, 1977," i.e., **after** the statute's enactment)(emphasis added).

[6] See *U.S. Rubber Co. v. McManus*, 211 S.C. 342, 45 S.E.2d 335, 338 (S.C. 1947); *Stogner v. California*, 539 U.S. 607, 615-16 (2003); *Int'l Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 243-44 (1976). See also S.C. Code Ann. §15-3-50 ("No person shall avail himself of a disability unless it existed when his right of action accrued.").

accrues the limitation shall not attach until they **all** be removed." Id. (emphasis added). This general principle is consistent with the South Carolina legislature's "whichever occurs later" philosophy, a philosophy that not only is expressly embodied in the text of §15-3-555(A), but in other statutory tolling provisions as well, such as for medical malpractice or for tort claims against the sovereign.[7]

The Citadel may contend that the statute of limitations set out in §§15-78-110 and the discovery tolling provision set out in §15-3-40 should take priority over §15-3-555(A)'s twin tolling provisions because §15-3-535 and §15-3-40 both are of older vintage and are more generally applicable than §15-3-555.[8] This argument would turn the law on its head. A fundamental canon of statutory construction establishes that

> "[w]here there is one statute addressing an issue in general terms
> and another statute dealing with the identical issue in a more
> specific and definite manner, the more specific statute will be
> considered an exception to, or a qualifier of, the general statute and
> given such effect."

---

[7] Thus, pursuant to S.C. Code Ann. §15-3-545, medical malpractice claims generally "must be commenced within three years from the date of the treatment, omission, or operation giving rise to the cause of action or three years from date of discovery or when it reasonably ought to have been discovered," with the caveat that "[n]otwithstanding the provisions of Section 15-3-40, if a person entitled to bring an action against a licensed health care provider acting within the scope of his profession is under the age of majority at the date of the treatment, omission, or operation giving rise to the cause of action, the time period or periods limiting filing of the action are not tolled for a period of more than seven years on account of minority, and in any case more than one year after the disability ceases." §15-3-545(A).

Similarly, claims filed against the sovereign under the South Carolina Tort Claims Act, S.C. Code Ann. §§15-78-10, et seq. (Supp. 2012), must be "commenced within two years of the date the loss was or should have been discovered," with an additional, backup tolling "except[ion]" provided for "in Section 15-3-40," i.e., the general minority tolling statute.

[8] Section 15-78-110 was enacted by Act No. 463, §1, 1986 S.C. Acts (and re-stated by Act No. 352, §9, 1988 S.C. Acts), while §15-3-40 was enacted by 1962 Code (and last re-stated by Act No. 234, §1, 1996 S.C. Acts), which makes both statutes older than §15-5-555, which was enacted by Act No. 102, §3, 2001 S.C. Acts. Both statutes also are indisputably broader and more "general" than §15-5-555.

23

*Denman v. City of Columbia*, 387 S.C. 131, 138, 691 S.E.2d 465, 468 (S.C. 2010)(quoting *Spectre, LLC v. S.C. Dept. of Health and Envtl. Control*, 386 S.C. 357, 688 S.E.2d 844, 851 (S.C. 2010)).

This principle is especially true when the older statute contains more general language while the newer statute—such as §15-3-555—is specifically worded to cover a narrower class of persons or a unique set of factual circumstances, like sexually abused minors. Id. Simply put, "specific laws prevail over general laws, and later legislation takes precedence over earlier legislation." *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 412-13, 526 S.E.2d 716, 719 (S.C. 2000).

Given the "'basic presumption … that the legislature has knowledge of previous legislation when later statutes are passed on a related subject,'" *South Carolina v. Baucom*, 531 S.E.2d 922, 924 (S.C. 2000)(citation omitted), the S.C. General Assembly could have drafted §15-5-555 as to exempt its application to TCA claims.

Thus, the legislature could have drafted §15-5-555 to say it covered "an[y] action to recover damages for injury to a person arising out of an act of sexual abuse or incest *except* **an action subject to or lodged pursuant to the TCA**." The legislature did not do so. Instead, §15-5-555 states it covers "an[y] action to recover damages for injury to a person arising out of an act of sexual abuse," without any limitation whatsoever.

In the alternative, the General Assembly could have amended §15-78-110 or §15-3-40 to make it clear that neither was affected or restricted in any fashion by §15-3-555. The legislature did not do that either.

Furthermore, "'according to the great weight of authority,'" it is axiomatic "in [South Carolina] that where there is any doubt as to which of two statutes of limitation applies, the **doubt must be resolved in favor of the longer period**." *South Carolina v. Life Ins. Co. of Ga.*,

24

254 S.C. 286, 299, 175 S.E.2d 203, 209-10 (S.C. 1970)(emphasis added; quoting *Scovill v. Johnson*, 190 S.C. 457, 3 S.E.2d 543, 545 (S.C. 1939)). There is no reason the same principle should not apply to tolling statutes.

Finally, The Citadel may contend that §15-3-555 is not a twin-headed tolling provision but rather a full-fledged statute of limitations. Even if that were true, the Plaintiff's claims still would be timely as he has alleged and the Citadel has not disputed his complaint before he was twenty-seven years old. Nor, for the reasons detailed above, can The Citadel successfully maintain that the TCA's older and more general statute of limitations trumps §15-3-555's newer and more specific provisions.

III. **In the Event That S.C. Code Ann.§ 15-3-555 Is Found Not To Apply, The Record Contains Questions of Material Fact Regarding Tolling Under The Discovery Rule and as to The Existence of "Deliberate Acts of Deception," and a "Systematic Practice of Secrecy and Concealment" under the South Carolina Supreme Court's Decision in *Doe v. Bishop of Charleston*.**

## South Carolina's Long-Standing Tolling Statute, S.C. Code Ann. §15-3-535, Also Tolled Doe's §1983 Claim

The Citadel also may assert that Plaintiff's claims also are not saved by §15-3-555, supposedly because even as an 10-year old boy in 2000, the Plaintiff either "contemporaneously" knew or should have known that: (a) Arpaio's sexual assaults were unlawful, harmful, and tortious; (b) that The Citadel's grossly negligent supervision of Arpaio caused the Plaintiff physical, emotional, and psychological injuries; and (c) The Citadel's own tortious acts and omissions were "contemporaneously," i.e., immediately, actionable.

The Citadel lacks clean hands to complain that the Plaintiff lacks good faith to invoke the discovery rule to attempt to delay the commencement of the statute of limitations. As set forth below, following the first allegation against counselor Arpaio to the Charleston Police Department ("CPD") in July of 2001, The Citadel made every effort to maintain the status quo,

to purposely conceal the Arpaio's misconduct from those who had been exposed to sexual assault by counselor Arpaio (and to their families), and to further engage in a pattern and practice of deliberate concealment of sexual misconduct which had occurred and was still occurring within the Summer Camp. The Citadel's galling lack of clean hands is reflected in the facts detailed below.

The Citadel had induced Doe, his parents, and people like them to allow minors to attend The Citadel Summer Camp by assuring them that camper safety was The Citadel's top priority. Nevertheless, not only did The Citadel disregard the grave dangers counselor Arpaio posed to Doe and campers like him in the months and years **before** Arpaio's brutal acts occurred, and not only did The Citadel ignore these acts **while** were they occurring, but **after** those acts had occurred and became known to The Citadel it devoted repeated and consistent efforts—stretched out over months and years—to denying Arpaio ever had committed any illegal and wrongful acts and to denying that anyone, including Plaintiff, had been harmed by Arpaio's acts and The Citadel's own acts and omissions.

Perhaps most relevant to the concealment analysis, however, The Citadel made **no attempt** to advise the campers or the parents of campers who had been exposed to Arpaio in the years prior to 2001, including the Plaintiff, of the criminal charges against counselor Arpaio and the need to discuss any potential sexual contact with their children. (Confidential Exhibit 6, 06-25-13 Colonel Lackey Depo, Volume I at Page 101, Lines 21-25; Page 102, Lines 1-2); (Exhibit 9, Brig. Gen. Mace Depo, at Page 124, Lines 12-21). Further, Summer Camp Deputy Director Jennifer Garrott stated that it was improper for The Citadel to fail to make such a notification. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 101, Lines 16-25; Page 102, Lines 1-10).

Equally relevant, and more shocking still, prior to the incoming class of campers in 2003, The Citadel engaged in an elaborate public relations conspiracy in an attempt to prevent news of

26

Arpaio's misconduct from reaching other victims, other victims' parents, and the public at large. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 70, Line 6 through Page 90, Line 16). This conspiracy was undertaken despite The Citadel's duty to ensure that minor victims of sexual assault within a state institution would come forward and obtain medical treatment and psychological care, and The Citadel's express duty as a Reporter under South Carolina law to report all suspected instances of child abuse.

The public was first alerted that The Citadel's agents and employees had committed sexual abuse and related offenses, and on a massive scale, in late 2001 when the Naval Criminal Investigative Service ("NCIS") initiated its investigation. Arpaio was court martialed and subsequently convicted in 2003, and The Citadel said little and did less.

Although The Citadel continued to tout the Summer Camp's safety record as blemish-free, and thus continued to induce parents to fill The Citadel's bed with young campers and to fill The Citadel's coffers with fresh cash, throughout the six plus years following Arpaio's assaults on Doe not only did The Citadel continue to tout the Summer Camp's safety record but The Citadel knew much more than it said and knew more or readily could have discovered more than the CPD, prosecuting military authorities, NCIS, or the media did. Although The Citadel had a duty to speak to prospective campers and a duty to alert former campers and their guardians, specifically including the Plaintiff and his legal guardian, about Arpaio's wrongful acts— particularly because of the grave public health danger stemming from unprotected rapes—The Citadel said nothing.

In an effort to ensure that there was no cause for alarm following the first report of abuse by Arpaio, The Citadel promised to take actions to preserve the safety of minor campers within its custody. In 2003, then Camp Director Jennifer Garrott issued a letter to the parents of incoming campers stating "[w]e take great pains to assemble a staff of counselors who have the

27

talent, disposition and enthusiasm to be positive role models and mentors. We interview prospective counselors and pay attention to details, checking references and doing background checks on all those we hire." (Exhibit 15, 2003 Letter of Jennifer Garrott). Garrott added, "[t]he well-being and happiness of campers is our top priority." (Id.). These statements subsequently were shown to be false.[9]

At the same time that The Citadel was refusing to take remedial measures to prevent future abuses, the Citadel was also making it abundantly clear that it had actual knowledge of the existence of additional victims of Arpaio's sexual abuse. Former Camp Supervisor Colonel John Lackey recently confirmed that he knew, based on the Arpaio case, that child molestations were typically serial in nature. (Confidential Exhibit 2, 06-26-13 Colonel Lackey Depo, Volume II at Page 326, Lines 1-4).   In 2003, The Citadel provided training to incoming counselors highlighting that sixty-seven percent (67%) of all reported sexual assaults occur to children ages 17 and under, but that only one in ten victims actually report the abuse. (Confidential Exhibit 7, 08-28-13 Garrott Depo at Page 67, Lines 15-19; Page 69, Lines 5-25). The Citadel knew, based on its own internal documents, that those children who had been exposed to sexual assault within their institution and had *yet* to come forward were at greater risk of long-lasting psychological, emotional, social, and physical problems. (Confidential Exhibit 6, 06-25-13 Colonel Lackey Depo, Volume I at Page 202, Lines 14-24).  The Citadel knew, based upon its own internal documents, that the risks to those exposed to sexual abuse within its barracks included suicide

---

[9] Garrott was later asked in deposition "[s]ince this Arpaio thing, has there been any major change in the way that you run the camp," to which she responded with an unqualified "[n]o." (Exhibit 16, 07-07-04 Garrott Depo at Page 87, Lines 18-21). Garrott later admitted that the remedial measures The Citadel had undertaken subsequent to the CPD's investigation were totally inadequate to prevent the widespread abuse that happened within The Citadel Summer Camp confines in the years following Arpaio's abuse of Doe. (Confidential Exhibit 4, 10-22-14 Garrott Depo at Page 38, Lines 18-25; Page 39, Lines 1-9; Page 90, Lines 24-25; Page 91, Lines 1-5). Brig. General James Emory Mace, Commandant of The Citadel, also later confirmed that there was no major overhaul of the camp in 2001 and 2002. (Exhibit 9, Brig. Gen. Mace Depo at Page 118, Lines 10-14).

and self-mutilation. (Confidential Exhibit 2, 10-25-13 Colonel Lackey Depo, Volume II at Page 273, Lines 22-25; Page 274, Lines 1-16).    The Citadel had actual knowledge that school physicians had allowed strange abrasions to the genitals of minor Summer Campers to go unreported. (Exhibit 6, Deposition of Major Harward, Volume II at Page 72, Lines 1-18). During this time period, The Citadel also continued to foster an acceptance of attempts by its employees to sweep allegations of sexual misconduct of minor Summer Campers under the rug. For example, The Citadel knew that its Safety and Education Officer for the year 2001 (Ashley Lyons) had received a complaint of sexual assault by a 10 year old child, had told the child to forget about it, and had initially lied to the CPD about the child having reported the assault to her. (Confidential Exhibit 8, 08-21-13 Garrott Depo at Page 111, Lines 3-23). The Citadel knew, as late as 2005 (the date of the deposition of Major Phillip Harward, if not much earlier) that its own safety and education officer for the year 2000 (Robert Lyon), among others, had taken steps to impede the criminal investigation into Arpaio's sexual misconduct. (Exhibit 6, Major Harward Depo, Vol. II at Page 36, Lines 7-21; Page 37, Lines 2-4).

With knowledge that additional victims, such as the Plaintiff, had attended their Summer Camp and been exposed to counselor Arpaio, The Citadel purposely avoided contact with law enforcement agencies and officers who could potentially confirm the identities of these additional victims. The Citadel knew that the CPD had, in very short order after being notified of the first complaint against Arpaio, easily uncovered numerous violations of Summer Camp safety policies. (Confidential Exhibit 6, 06-25-13 Lackey Depo, Volume I at Page 102, Lines 3-25; Page 103, Lines 1-25; Page 104, Lines 1-25; Page 105, Lines 1-11). Despite this knowledge, The Citadel took no steps to follow up with the CPD investigator who had very easily uncovered the contemporaneous, widespread abuse of Summer Camp safety policies. (Confidential Exhibit 6, 06-25-13 Lackey Depo, Volume I at Page 105, Lines 12-24; Page 107, Lines 10-19). The

Citadel refused to monitor the activity and testimony that took place at Arpaio's court martial, which specifically related to the conduct that happened on the Summer Camp campus. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 53, Lines 14-25; Page 54, Lines 1-2). The Citadel completely failed to follow up with the U.S. Navy in any fashion, despite the fact that the NCIS had amassed a wealth of information regarding the sexual assaults that had occurred (and continued to occur) on the campus of The Citadel Summer Camp. See (Exhibit No. 8, Maj. Gen. Grinalds Depo at Page 89, Lines 7-10).

The Citadel made no attempt to notify parents of minors who had attended the Summer Camp in 2001 and 2000 that a pedophile had been caught living amongst their minor children and had been active during that summer. (Confidential Exhibit 6, 06-25-13 Lackey Depo, Volume I at Page 101, Lines 8-20); (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 149, Lines 12-25, Page 150, Lines 1-25; Page 151, Lines 1-24). The Citadel made no attempts to undertake any further investigation into Arpaio's prior abuse of minors who had been in its custody, or to identify and notify the additional victims. See (Confidential Exhibit 6, 06-25-13 Lackey Depo, Volume I at Page 128, Lines 8-18; Page 130, Lines 8-11); (Exhibit 9, Brig. Gen. Mace Depo at Page 111, Lines 17-23).

The Citadel purposely failed to follow up with additional witnesses who had knowledge of Arpaio's tendencies for abuse. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 66, Lines 8-23); (Exhibit 9, Brig. Gen. Mace Depo at Page 114, Lines 3-7); (Exhibit 8, Major General Grinalds' Depo at Page 92, Lines 8-12). The Citadel purposely failed to identify witnesses with knowledge of Arpaio's misconduct in subsequent litigation. (Confidential Exhibit 7, 08-28-13 Garrott Depo at Page 21, Lines 6-25; Page 22, Lines 1-25; Page 23, Lines 1-9).

Consistent with its pattern of deliberate concealment of instances of sexual assault on its campus by its agents and employees, The Citadel actively evaded victims of sexual abuse who

30

subsequently came forward and attempted to break their silence. (Confidential Exhibit 7, 08-28-13 Garrott Depo at Page 32, Lines 14-25; Page 33, Lines 1-25; Page 34, Lines 1-16). The Citadel failed to follow its own Sexual Harassment policy when a former counselor returned to the Summer Camp to masturbate in the presence of 10-15 year old campers in the locker room. (Confidential Exhibit 6, Colonel Lackey Deposition, Volume I at Page 150, Lines 23-25; Page 151, Lines 1-15; Page 152, Lines 1-12; Page 153, Lines 15-25; Page 154, Lines 1-2; Page 155, Lines 2-9, 15-18; Page 190, Lines 14-21; Page 191, Lines 9-24); (Confidential Exhibit 2, Colonel Lackey Depo, Volume II at page 229, Lines 15-24; Page 234, Lines 9-16, Page 235, Lines 6-15; Page 236, Lines 11-25; Page 237, Lines 1-25; Page 238, Lines 1-23, Page 239, Lines 1-7). The Citadel fired minor victims of statutory rape and/or assault working within the camp rather than reporting the rapes to the proper authorities, as required by South Carolina law. (Confidential Exhibit 7, 08-28-13 Garrott Depo at Page 124, Lines 1-25; Page 125, Lines 1-25; Page 126, Lines 1-25; Page 127, Line 1-10). The Citadel apparently failed to discipline a counselor who was caught having oral sex with a *camper*. (Confidential Exhibit 5, 10-31-13 Major Bates Depo at Page 346, Lines 4-25; Page 347, Lines 10-19; Page 348, Lines 19-23). The Citadel failed to fire subsequent counselors for known policy violations, even though the failure to act caused the sexual abuse of up to fifty additional victims by the very same perpetrator who was found to have violated the Summer Camp's anti-cohabitation policy in 2003. (Confidential Exhibit 4, 10-22-13 Garrott Depo at Page 56, Lines 24-25; Page 57, Lines 1-13).

In this light, the South Carolina Supreme Court's recent decision in *Doe v. Bishop of Charleston*, 407 S.C. 128, 754 S.E.2d 494 (2014),—in which the Court held that plaintiffs were entitled to prove that defendants' misconduct tolled the statute of limitations on sexual abuse that had occurred some 36 to 44 years prior to suit—is particularly instructive. As that Court explained:

> "The statute of limitations on a negligence claim accrues at the time of the negligence, or when facts and circumstances would put a person of common knowledge on notice that he might have a claim against another party (discovery rule)." **Deliberate acts of deception** by a defendant calculated to conceal from a potential plaintiff that he has a cause of action toll the statute of limitations. Appellants allege respondents engaged in a **systematic practice of secrecy and concealment of their knowledge of sexual abuse by employees**, including the employee who appellants allege committed the abuse at issue. **The employer's knowledge of an employee's dangerousness** is an element of the tort of negligent supervision. Thus, **appellants' allegations could, if proven, toll the statute of limitations**.

*Bishop of Charleston*, 407 S.C. at 128, 754 S.E.2d at 501(emphasis added; citations omitted).

In this case, just as in *Bishop*, The Citadel repeatedly and "[d]eliberate[ly]" committed "acts of deception .... calculated to conceal from [Doe and other] potential plaintiff[s] that he has a cause of action ...." Id. As in *Bishop*, in this case The Citadel "engaged in a systematic practice of secrecy and concealment of their knowledge of sexual abuse by employees, including [by Arpaio] who[m] [Doe] allege[s]" raped him. Id. As in *Bishop*, in this case The Citadel's "knowledge of [Arpaio's] dangerousness is an element of the tort of negligent supervision." Id. Finally, and most important, for purpose of summary judgment the Plaintiff does not need prove his allegations regarding The Citadel's conspiracy of silence and concealment. Rather, the record indicates an issue of material fact as to this issue, which can only be resolved by the jury.[10]

---

[10] Fifteen years ago, the South Carolina Supreme Court held that a minor sexual abuse plaintiff may assert §15-4-535's discovery rule in a sexual abuse case. In doing so, that Court offered an analogy regarding the proper application of the discovery rule that is equally apt here.

> "The present case might profitably be compared with a hypothetical one. Suppose that the defendant threw acid in a plaintiff's face and blinded her. As a result of her blindness, which was caused by the defendant, the plaintiff has become disabled from making an identification, and no other evidence is available. Twenty-five years later, however, a new procedure restores the plaintiff's 20:20 eyesight. She identifies the defendant as her assailant from a photograph taken of the defendant on the day of the assault. To apply the statute of limitations against the plaintiff in such a case to defeat recovery would surely be intolerable, for to do so would permit the assailant to profit from his own wrong."

Doe has argued above that the statute of limitations was tolled by virtue of §15-3-555(A)'s twin tolling provisions. If, however, for whatever reason, the Court decides §15-3-555(A) is inapplicable here, the Court nonetheless allow the finder-of-fact to determine whether , pursuant to *Bishop,* and *Moriarity,* The Citadel's "**[d]eliberate acts of deception**" and "**systematic practice of secrecy and concealment**," *Bishop,* 754 S.E.2d at 501, tolled the TCA's statute of limitations, § 15-78-110.

## IV.    The Record Contains Evidence of Estoppel Sufficient to Require a Bench Trial on the Issue.

Assuming, arguendo, that this Court does not dismiss Defendant's motion based on upon an application of S.C. Code Ann. §15-3-555 alone, the factual record above requires that this Court conduct a bench trial to determine whether The Citadel is to be estopped from asserting its statue of limitations defense.

A defendant is estopped to assert the statute of limitations defense against a plaintiff's claim if the defendant's conduct has induced the delay that otherwise would give operation to the statute. *Republic Contracting Corp. v. S. Carolina Dep't of Highways & Pub. Transp.*, 332 S.C. 197, 211, 503 S.E.2d 761, 768 (Ct. App. 1998) (citing *Dillon County Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc.,* 286 S.C. at 218, 332 S.E.2d at 561). The conduct may involve inducing the plaintiff either to believe that an amicable adjustment of the claim will be made without suit or *to otherwise forbear exercising the right to sue. Id* (emphasis added).  Estoppel by silence

---

*Moriarty v. Garden Sanctuary Church of God*, 534 S.E.2d 672, 679 (S.C. 2000)(quoting *Farris v. Compton*, 652 A.2d 49, 59 (D.C. 1994)), overruled in part on other grounds by *South Carolina v. Cherry*, 606 S.E.2d 475 (S.C. 2004). The Court concluded "the discovery rule exists to avoid the harsh and unjust result of closing the courtroom doors to a plaintiff whose 'blameless ignorance' resulted in a failure to pursue a cause of action within the limitations period" and "it is not the policy of the law to unjustly deprive an injured person of a remedy," id. at 678-79 (quoting *Urie v. Thompson*, 337 U.S. 163, 170 (1949), and then remanded so the plaintiffs could proceed to trial.

33

arises where a person owing another a duty to speak refrains from doing so and thereby leads the other to believe in the existence of an erroneous state of facts. *S. Dev. Land & Golf Co., Ltd. v. S. Carolina Pub. Serv. Auth.*, 311 S.C. 29, 33-34, 426 S.E.2d 748, 751 (1993) (citing *Ridgill v. Clarendon County,* 192 S.C. 321, 6 S.E.2d 766 (1939)). Silence, when it is intended, or when it has the effect of misleading a party, may operate as equitable estoppel. *Id.* (citing *Welch v. Edisto Realty Co.,* 170 S.C. 31, 169 S.E. 667 (1933)). There is no requirement that the person whose silence misleads another have actual knowledge of the true facts if circumstances are such that knowledge is necessarily imputed to him. *Id.* (internal citations omitted). Negligence will take the place of the intent to deceive when there is a duty to disclose. *Id.* Our Supreme Court has held that equitable estoppel may involve a question of fact for the fact-finder, and that the appropriate fact-finder is the Court during the course of a bench trial. *S. Dev. Land & Golf Co., Ltd. v. S. Carolina Pub. Serv. Auth.*, 311 S.C. 29, 33-34, 426 S.E.2d 748, 751 (1993).

As set forth in detail in Section III above, The Citadel took many affirmative steps to hide from the Plaintiff's parents that he had been exposed to sexual assault within the confines of its barracks. The Citadel had actual knowledge that no later than 2003, the year counselor Arpaio pled guilty, that only one in ten childhood victims of sexual assault reported their abuse. (Confidential Exhibit 7, 08-28-13 Garrott Depo at Page 67, Lines 15-18; Page 69, Lines 5-25). Several members of the Citadel Summer Camp staff, to include Robert Lyon, had actual knowledge that additional victims had been exposed to sexual assault (including the minor campers depicted in the photographs also depicting Robert Lyon, noted above). Our very own Court of Appeals stated in 1999 that "[t]o cope with the horror of their experiences, many child sexual abuse victims develop dissociative defense mechanisms similar to those observed in combat veterans and victims of other atrocities . . . [d]issociation can take a number of forms,

34

including traumatic amnesia-more commonly known as repressed memory." *Moriarty v. Garden Sanctuary Church of God*, 334 S.C. 150, 156, 511 S.E.2d 699, 702 (Ct. App. 1999) aff'd, 341 S.C. 320, 534 S.E.2d 672 (2000) (holding modified by *State v. Cherry*, 361 S.C. 588, 606 S.E.2d 475 (2004)) (internal citations omitted). The Court added that "[r]epression of memories is often a coping mechanism for children who are sexually abused . . . [f]eelings of confusion and helplessness resulting from the inability to stop the abuse or to seek outside assistance lead many victims to internalize the pain, fear, confusion, and guilt . . .[t]his internalization then leads to a denial of the events and a repression of memories of the abuse incidents . . . [r]epression of traumatic memories keeps painful or unacceptable ideas, impulses, and feelings out of conscious awareness and enables the victim to survive by controlling thoughts and feelings to the point at which there is no recognition of victimization." *Id*. at 334 S.C. at 156, 511 S.E.2d at 703-04 (internal citations omitted). The Court highlighted that "[m]any, if not most, survivors of child sexual abuse develop amnesia that is so complete they simply do not remember they were abused at all," and that "[c]hildren abused at an earlier age are more likely to repress than those abused at a later age." *Id* at 334 S.C. 160, 511 S.E.2d 705 (internal citations omitted).

Despite the knowledge of the known reluctance of childhood rape victims to come forward, as set forth by our own Court of Appeals and the information provided to the staff of the Citadel Summer Camp by its own employees, The Citadel took steps over the course of over 10 years to actively conceal the sexual abuse which happened within their institution to children known to have been both exposed and victimized. See Pages 29-31 above. The Citadel had actual knowledge that additional victims, such as the Plaintiff, existed and had not come forward for treatment. See (Exhibit 17, Deposition of Major Phillip Harward, Volume I at Page 104, Lines 20-25; Page 105, Lines 1-8 – Need Major Redactions of Victims Names). Further, the staff members of The Citadel were considered mandatory reporters under S.C. Code Section 63-

7-310, and thus had a duty not to report only to the parents of the children within their custody who had been exposed to abuse, but also to child protective services that a known number of their campers had been exposed to sexual assault. The Citadel actually made counselors sign an affidavit stating that they understood that they were mandatory reporters, though the management of the camp failed to report multiple incidents. (Confidential Exhibit 5, 10-31-13 Major Bates Depo at Page 398, Lines 9-25; Page 399, Lines 1-19). As the South Carolina Supreme Court has dictated, negligence will take the place of an intent to deceive when there is a duty to disclose. *S. Dev. Land & Golf Co., Ltd. v. S. Carolina Pub. Serv. Auth.*, 311 S.C. 29, 33-34, 426 S.E.2d 748, 751 (1993). However, in an attempt to save face and money, the Citadel engaged in a systematic attempt for a period of over 10 years to cover up the atrocities, which happened within the barracks of their institution, atrocities that forever altered the course of the lives of many children. Now, faced with a trial which will expose these atrocities to a Charleston County jury, The Citadel and/or their insurance carrier has the audacity to claim that a rape victims sexually assaulted within their institution should have spoken up sooner. Given the record before this Court, before evading any liability whatsoever on the basis of a statute of limitations affirmative defense, South Carolina law requires that the Citadel present these spurious claims to this Court in the context of a bench trial, wherein those responsible for the cover up can be subpoenaed before this Court to explain their actions under oath.

## V.    S.C. Code Section 15-78-60(25) Regarding Supervision of Prisoners and Students Has No Application to this Case

In its second ground for relief, the Citadel has claimed that it is entitled to summary judgment based upon an application of S.C. Code Ann. § 15-78-60(25). This code section provides an exception to liability under the Tort Claims Act for causes of action arising out of a "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except

36

when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15-78-60. The burden of proving any of these exceptions to the general rule of governmental liability as a private individual "'is upon the governmental entity asserting it as an affirmative defense.'" *Duncan v. Hampton Cnty. Sch. Dist. No. 2*, 335 S.C. 535, 543, 517 S.E.2d 449, 453 (Ct. App. 1999)( quoting *Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 430, 445 S.E.2d 439, 440 (1994)).

It is undisputed that at the time of the events alleged in this action, the Plaintiff was a 10 year old citizen and resident of the state of Florida. The Plaintiff was enrolled in the public schools in the state of Florida. The Plaintiff was and has at no time ever been a student within the public schools of the State of South Carolina. The Plaintiff, a ten year old elementary school student, was certainly not a cadet of The Citadel. No case law stands for the proposition that a paying attendee of a summer camp run by a South Carolina university is to be considered a "student" of that institution for purposes of the Tort Claims Act. Indeed, such an assertion is absurd. While the Plaintiff certainly became a captive during his time within The Citadel Summer Camp, he cannot be legally classified as a "prisoner" or "inmate" for purposes of this statute. No other named group within this code section can arguably come close to characterizing The Citadel's legal relationship, duty, and obligations to the Plaintiff. As such, The Citadel can claim no immunity from suit under this provision.

Further, even if this Code Section were to somehow have any application to this case, there remains a question of fact, based upon the record as set forth above, as to whether or not The Citadel exercised its supervision in a grossly negligent manner. *See Hollins v. Richland Cnty. Sch. Dist. One*, 310 S.C. 486, 490, 427 S.E.2d 654, 656 (1993) (holding that the issue of whether a School/School District exercised its supervision in a grossly negligent manner is an issue of fact to be resolved by the jury).

## VI.    The Plaintiff's Respondeat Superior Allegations Must Be Resolved by a Jury.

The Citadel has further moved for summary judgment on the basis that the institution cannot be held responsible under the doctrine of Respondeat Superior for the assault and battery and intentional infliction of emotional distress claims against its employee, counselor Arpaio. While The Citadel's arguments could be availing within a normal workplace environment, they have no application within the confines of a residential camp in which The Citadel undertook (for profit) to place minor children within its custody, care, and control for 24 hours per day.

"'The modern doctrine of respondeat superior makes a master liable to a third party for injuries caused by the tort of his servant committed within the scope of the servant's employment.'" *Wade v. Berkeley Cnty.*, 330 S.C. 311, 318-19, 498 S.E.2d 684, 688 (Ct. App. 1998) (quoting *South Carolina Ins. Co.,* 290 S.C. at 179, 348 S.E.2d at 621). When a master-servant relationship exists, the tort of the servant is imputed to the master by law, without any requirement of fault on the part of the master. *Id.* Under this doctrine, the master is liable for the torts of his servant even when the servant acts against the express instructions of his master, so long as the servant acts to further the master's business. *Id.*    "Any doubt as to whether the servant was acting within the scope of his authority when he injured a third person must be resolved against the master, at least to the extent of requiring that the question be submitted to the jury." *Froneberger v. Smith*, 406 S.C. 37, 748 S.E.2d 625, 633 (Ct. App. 2013)

In the instant case, the record clearly indicates that counselor Arpaio was serving as a counselor within The Citadel's residential camp. The Citadel contractually assumed care, custody, and supervision of its minor campers, 24 hours per day, for the duration of the three-week camp sessions. As set forth above, the first act of sexual molestation against the Plaintiff occurred while counselor Arpaio was in the process of fulfilling his role of supervising the minor campers as they took their daily showers. The second act of sodomy and rape occurred within

38

the barracks of The Citadel while counselor Arpaio was actively engaged in performing his role as a residential counselor and supervisor of young children during in the most critical evening hours. The role of nighttime supervision was the most important role bestowed upon the counselors at The Citadel Summer Camp. The Citadel recently acknowledged the importance of nighttime supervision, and that it realized the importance of this role even before placing counselor Arpaio in a position of authority within the barracks. (Confidential Exhibit 2, Colonel Lackey Depo, Volume II at Page 272, Line 25; Page 273, Lines 1-10). Though The Citadel delegated this important responsibility to counselor Arpaio, it now apparently claims for purposes of its motion that he was not performing the role that it specifically assigned and entrusted to him at the time of the Plaintiff's abuse. While the heinous nature of counselor Arpaio's act is without question, the fact remains that these heinous acts occurred *during* his shift; *while* he was working; *within* the barracks of The Citadel Summer Camp; *during* a time period within which The Citadel had assumed (for profit) a custodial role over the Plaintiff. South Carolina Respondeat Superior law does not allow an employee to magically morph out of his job duties solely during the time period within which a criminal act occurs should that act clearly occur within the scope of employment. Given the custodial nature of the camp, the 24 hour nature of counselor Arpaio's role as a counselor, and the fact that the assaults occurred during camp sessions within camp barracks, no "frolic" or "detour" analysis can arguably come into play as it might in a traditional Respondeat Superior workplace analysis. Thus, at a minimum, it is up to the finder-of-fact to conclude whether counselor Arpaio was acting within the scope of his employment at the time of the gruesome assaults upon the Plaintiff. For this reason, The Citadel's motion for summary judgment as it relates to the Plaintiff's claims of assault and battery and intentional infliction of emotional distress cannot be granted at this stage in the proceedings.

## VII. The Plaintiff Has Presented More Than a "Scintilla of Evidence" that He Suffered and Intentional Infliction of Emotional Distress.

In addition to challenging the Plaintiff's Intentional Infliction of Emotional Distress claims on the basis that the Plaintiff cannot recover against The Citadel on a Respondeat Superior basis, The Citadel, apparently, separately contends that there is no evidence sufficient to support a jury verdict on this claim. As set forth in detail above, the Plaintiff has come forward with evidence sufficient to support his allegations of intentional infliction of emotional distress.

Our Supreme Court has held that "[t]he tort of intentional infliction of emotional distress arises when one by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Upchurch v. New York Times Co.*, 314 S.C. 531, 536, 431 S.E.2d 558, 561 (1993) (citing *Ford v. Hutson,* 276 S.C. 157, 162, 276 S.E.2d 776, 778 (1981)). In order to recover for the intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Id.*

The Plaintiff incorporates all references to the record as set forth above, particularly the excerpts from his own deposition. Should The Citadel come forward with a memorandum of law explaining how the record before the Court is insufficient to support a jury verdict as to this claim, the Plaintiff reserves the right to supplement its position by way of a supplemental response.

40

## CONCLUSION

For the reasons set forth above and for whatever reasons this Honorable Court deems appropriate, Plaintiff respectfully request that this Honorable Court deny The Citadel's Motion for Summary Judgment.

Respectfully Submitted,

J. Edward Bell, III
David W. Harwell
Scott C. Evans
Bell Legal Group, LLC
219 Ridge Street
Georgetown, SC 29442
Telephone: 843-546-2408
Facsimile: 843-546-9604

**Attorneys for the Plaintiff**

Georgetown, South Carolina
April 15 2014